JAMES GODFREY, by JOHN GODFREY, His Next Friend, v. KANSAS CITY LIGHT & POWER COMPANY, Appellant.

In Banc, July 2, 1923.

1. **ELECTRIC WIRES: Insulation: Knowledge: Licensee: Pursuit of Pleasure.** An electrical company, if reasonably chargeable with knowledge, or of facts making it reasonably probable, that persons may come into close proximity to its wires for purposes of either business or pleasure, must use every precaution accessible to insulate its wires at such places and to use the utmost care to keep them so.

   *Held,* by GRAVES, J., dissenting, that this doctrine should not be extended to persons on pleasure bent nor to mere licensees or trespassers.

2. ———: ———: **In Trees: Injury to Child.** Electrical companies must take notice of the natural instinct of boys to climb trees, especially trees bearing nuts or fruit, and if they string their uninsulated wires through such trees under circumstances which may reasonably charge them with notice of the probability of boys climbing the trees, and a boy climbs such a tree to get nuts or fruit, or even to satisfy his childish instinct to climb trees, and, without contributory negligence on his part, he is injured by coming in contact with the electricity carried by such uninsulated or dangerous wire, the company must respond in damages.

3. ———: ———: ———: ———: **Trespass.** The fact that the injured boy was trespassing on a third party's property at the time he climbed a walnut tree in search of nuts and came in contact with a high-tension, uninsulated electrical wire, is no defense to his suit for damages brought against the company to which the dangerous wire belonged.

4. ———: ———: ———: In Pasture: Outside of Corporate Limits: Anticipated Presence: Turn-Table Doctrine. The place where the twelve-year-old boy was injured was not within the corporate limits of any municipality, but was in a pasture, which was close to a great city and a small town, and bordered on a thickly-settled village, in which the boy resided. The pasture for a number of years had been a play-ground for children, and the half-grown walnut tree through which defendant had run its deadly uninsulated electric wire, and into which the boy climbed one August day in search of nuts, was in a little grove of walnut trees, which, for a number of years before he was injured by coming in contact with the wire, had been climbed by children to obtain walnuts without objection. *Held*, that, under the law requiring electrical companies to exercise the utmost care to make and keep their wires safe, so as not unnecessarily to destroy human life or limb, in the operation of their exceedingly dangerous but necessary business, it was the duty of the defendant to have reasonably anticipated the presence of the boy in the tree, and to have protected him by proper insulation or isolation of the wire, and failing to do so defendant is liable for his consequent damages, unless absolved by the boy's contributory negligence; and as he was not as a matter of law guilty of contributory negligence, the defendant's demurrer to the evidence was properly overruled.

*Held*, by JAMES T. BLAIR, J., concurring, with whom RAGLAND, J., concurs, that the doctrine of the attractive-nuisance or turn-table cases has no application to the facts of this case, and if it did it was not timely raised. The pasture had long been a playground for children, and defendant knew that fact; and an allegation in the petition that children were "attracted" to the place and that the tree was "easy to climb" was not an invocation of that doctrine.

*Held*, by GRAVES, J., dissenting, with whom WOODSON, C. J., concurs, that the case was pleaded and submitted on the attractive nuisance or turn-table doctrine, and that on that theory plaintiff cannot recover unless a long line of cases are overruled, and that doctrine ought not to be extended to a case like this.

5. **NEGLIGENCE**: Instruction: Absolute Duty: Ordinary Care: Ignoring Contributory Negligence: Knowledge of Danger. Where there was evidence that for a number of years children had climbed and gathered walnuts from trees in the little grove in the pasture bordering on the thickly-settled village, and that defendant had strung through one of them a high-tension, uninsulated electric wire, an instruction telling the jury that it was the duty of defendant to insulate the wire if "by the use of ordinary care it

could have been insulated and made harmless, and to use the utmost care to keep it insulated" did not make it the absolute duty of defendant to insulate the wire and make it harmless. And since said instruction required the jury to find that plaintiff "while in said tree, and at all times mentioned in the evidence, was not guilty of contributory negligence" it did not ignore the defense of contributory negligence. And since the petition alleged that plaintiff "did not know of the danger created by said wire" the instruction did not enlarge the issues, since his knowledge of the danger was an element of contributory negligence, which the jury was required to determine.

6. ———: ———: **Utmost Care: Definition.** An instruction defining utmost care as "such care as would usually be exercised by ordinarily careful and prudent persons engaged in the same or similar business under the same or similar circumstances to those shown in evidence, and any failure, if any, to exercise such care is negligence" is a definition of which defendant cannot complain, and if objectionable at all it is because it is too favorable to defendant.

7. ———: ———: **Contributory: Submission to Jury.** Defendant cannot complain that an instruction on contributory negligence was submitted to the jury, in that plaintiff was guilty of such negligence as a matter of law or not at all, where it had expressly pleaded contributory negligence.

8. ———: **Evidence: Short-Hand Statement of Facts.** Testimony that plaintiff was perfectly well and healthy, playful and cheerful before the accident, and afterwards was not very active or playful, and would cry easily, is admissible as a short-hand statement of facts.

9. ———: **Trial: Plaintiff's Position Near Jury: Leading Questions.** To permit plaintiff to stand near the jury while his physician is testifying and describing his injuries, and to permit the asking of certain leading questions, are both matters within the discretion of the trial court, and no ground for reversal unless the discretion is abused.

10. ———: **Excessive Verdict: $20,000.** Plaintiff was twelve years of age, and climbed up a walnut tree, through which defendant's uninsulated wire, carrying 2300 volts, was strung, and when his hand came in contact with the wire he fell fifteen feet to the ground. He was picked up, unconscious, and limp like a dead body; his hands and face were burned black; his hands were burned through and across the palm to the bone near the fingers; his right ear was burned; his eye was blackened, swollen shut and inflamed, and remained so for some time; he remained at the hospital for five or six weeks, and there underwent three opera-

tions, involving skin grafting, twenty or thirty pieces of skin being removed each time from his shoulders and hips and grafted upon his face and hands. At the trial two years later, there was a heavy bright-red scar on the right cheek, which will disfigure him, and which causes an involuntary twitching of the face when he opens his mouth or talks; his smile muscle is so affected that when he attempts to smile his mouth twists instead, and these conditions are permanent. Before the injury he was a strong, healthy, robust boy; now he is nervous, fidgety, easy to cry, does not sleep well and is apparently stunted in his growth; the left hand is smaller than the right, and is somewhat impaired; the vision of both eyes is impaired from the inflammation caused by the injury, and he will always have to wear glasses. *Held*, that a verdict for $20,000 is excessive by $5,000.

Appeal from Jackson Circuit Court.—*Hon. Samuel A. Drew*, Judge.

AFFIRMED.

*John H. Lucas, William C. Lucas* and *Ludwick Graves* for appellant.

(1)   The leading case of Hanna v. Iowa Central Railway Co., 129 Ill. App. 134, is conclusive both as to the application of the attractive-nuisance doctrine and contributory negligence in the instant case.   (2)   We especially call the court's attention to the allegations of the declaration in the Hanna Case at page 135, and ask the court to compare them with the allegations in the case at bar. In the case at bar the plaintiff pleaded "that said tree was a walnut tree some twenty-five feet in height, standing in a ditch or depression, so that the lower branches of said tree were fifteen or sixteen feet from the level of said green immediately surrounding said tree; that said tree was a small tree and grew at an angle with its base, and in its growth had thrown out numerous crotches, so that said tree was very easy for boys, even of tender years, to climb." And plaintiff's instruction numbered 1 submitted to the jury: "and that said tree was a small nut-bearing tree and grew in an angling or

leaning position, and had low and numerous crotches, and was very easy for boys of tender years to climb, if so," etc. This clearly is a submission, and an unauthorized and unjustified extension of the "attractive-nuisance doctrine." The appellant has conclusively shown in the principal brief that this court has absolutely refused to extend this doctrine beyond the actual turn-table cases.

*Garrett, Howell & Boley, John J. Hyde* and *Atwood, Wickersham, Hill, Leirs & Chilcott* for respondent.

(1) The overwhelming weight of the testimony establishes the fact that for many years the place where defendant maintained its deadly electric wire without insulation was a public recreation and amusement ground which large numbers of people, especially children, frequented. Under such circumstances this court, as well as the courts of sister states, have held a defendant liable for injuries occasioned to a child. Williams v. Gas & Electric Co., 274 Mo. 1; Thompson v. Slater, 197 Mo. App. 247; Kribbs v. Jeff. City L. & P. Co., 199 S. W. 263; Consolidated L. & P. Co. v. Healy, 65 Kan. 798, 70 Pac. 884; N. Y. & H. R. v. Fletcher, 271 Fed. (C. C. A.) 419; Edwards v. Kansas City, 104 Kan. 684, 180 Pac. 271; Talkington v. Washington W. & P. Co., 96 Wash. 386, 165 Pac. 87; Temple v. Light Co., 89 Miss. 1, 11 L. R. A. (N. S.) 449. See veritable brief on this identical question in 17 A. L. R. 833, and annotation in 14 A. L. R. 1023. (2) The boy was not guilty of contributory negligence as a matter of law. He testified he did not know of the dangerous presence of the wire before being injured. He could not be convicted of contributory negligence as a matter of law, because he had followed the instincts of childhood in climbing that walnut tree. Certainly any question of contributory negligence was a matter for the jury to pass upon. Williams v. Gas & Electric Co., 274 Mo. 1; 14 A. L. R. 1035; 17 A. L. R. 849. (3) No error was committed in the giving of instructions or the refusal of instruction offered by defendant. In-

structions involving identical facts have been approved by this very division of the court. Williams v. Gas & Electric Co., 274 Mo. 1. (4) No error was committed by the court in permitting plaintiff's mother and others testifying to expressions of pain and the physical appearance of plaintiff. Lindsay v. K. C., 195 Mo. 166, 181; McHugh v. Railroad Co., 190 Mo. 95; Estes v. Railway Co., 110 Mo. App. 731; Fellhauer v. Railroad Co., 191 Mo. App. 137, 148; Bennett v. Nor. Pac. Railroad Co., 15 L. R. A. 465; C. C. & I. R. Co. v. Newell, 104 Ind. 269; Miss. Cent. Railroad Co. v. Turnage, 24 L. R: A. (N. S.) 253, and cases annotated; N. P. Co. v. Urlin, 158 U. S. 271, 39 L. Ed. 977. (5) The evidence showed permanent impairment of the use of the boy's left arm; nervous system permanently injured; his eyes affected and growth stunted, and other grievous injuries showing a probable complete destruction of the ability of the boy to work and earn money. Larger amounts have been sustained for injuries not so severe. Under no circumstances was the verdict in the slightest degree excessive. Meeker v. Union Electric Light & Power Co., 216 S. W. 934; Stottler v. Railroad, 200 Mo. 107, 142; Pennington v. Railways Co., 213 S. W. 137, 140; Stedwell v. Chicago, 297 Ill. 486, 17 A. L. R. 829; Erie R. R. Co. v. Collins, 253 U. S. 77, 64 L. Ed. 794.

SMALL, C.—Personal injury suit. On the tenth day of August, 1919, the plaintiff, a boy about twelve years of age, while in a walnut tree gathering walnuts, came in contact with one of defendant's uninsulated electrical wires which ran through said tree, and received a shock therefrom which burned and seriously injured him.

The tree was in the pasture on the McElroy farm located on the Missouri River, a mile east of the eastern city limits of Kansas City. The land adjoining on the west belonged to the Missouri Pacific Railroad Company, and on the east to the Standard Oil Company. The town of Sugar Creek was located about a quarter of a mile

or less east of the south part of the farm and the Standard Oil Company's plant, with its Sugar Creek refinery and numerous tanks and buildings, was located about the same distance east of the north part of said farm. The intervening land belonged to the Standard Oil Company, but was mostly vacant and unimproved. The south part of the farm, embracing about 100 acres or more, was known as the McElroy pasture.

Said farm, including said pasture, had been platted and divided into ten-acre lots, but no streets or alleys had been platted therein. But the property immediately adjoining said farm and pasture on the south, and formerly a part of said farm, had been platted by the owners and called Jackson Lithia Place. By this plat, three east-and-west streets were laid out: Pacific Street immediately south of and adjoining the pasture; parallel with it and south of it a block, was Scarritt Avenue; and parallel with Scarritt Avenue and a block south of it, was Kentucky Avenue. Kentucky Avenue was a paved street and connected with Independence Road on the west running into Kansas City, and on the east extended into the town of Sugar Creek. There were also six streets running north and south about 300 feet, or a block, apart. Home Avenue was on the west line of the sub-division; then running east in order were Cedar, Huttig, Ash, Hardy and Poplar avenues. The two north-and-south blocks were about 600 feet in length. Huttig Avenue was paved with macadam from Kentucky Avenue to Pacific Street. Pacific Street was not paved or graded, but was partly in use. The other streets had been partly graded and oiled.

The whole farm for some years had been enclosed with wire fence. There was a stile at the southwest corner of the pasture; also two gates in the south fence, one at the north end of Ash Avenue, and the other at the north end of Huttig Avenue.

The plaintiff had lived with his parents for a number of years on Poplar Avenue in said Jackson Lithia Place, about a block and a-half south of Pacific Street,

and a short block, 235 feet, west of the east line of the pasture extended. The walnut tree in which plaintiff was injured was about a quarter of a mile north of Pacific Street, a few feet west of the east line of the pasture. It was in a small grove of about fifty walnut trees. It was on high ground, but in a draw or depression. There was a pond about 100 feet in diameter, in the pasture, about 700 feet north of Pacific Street and 900 feet west of the walnut grove. Still further north of both the grove and the pond were the old McElroy home or mansion and the house of the care-taker.

At the time of the accident, and for a number of years before, the plaintiff's evidence tended to show that, within one block south of Pacific Street or the south line of the pasture and within three blocks east-and-west, there were as many as thirty or forty residences. And within the general vicinity of two blocks south there were as many as 150 to 200 residences. On the north side of Kentucky Avenue, between Home and Cedar avenues, there was a public school attended by some 300 pupils and a church at the northeast corner of Ash and Kentucky avenues. That families, including a large number of children, lived in these houses, and that they and the school children and teachers and church and lodge people and boy scouts used the pasture for the purpose of holding picnics and camping parties, gathering flowers and pawpaws and walnuts. The children also used it for playing ball and other games. The boys used the pond very frequently, as a swimming hole in the summer time, and to skate upon in the winter. The pasture was also used by some of the neighbors, including plaintiff's father, to pasture their cows. The employees of the Standard Oil Company also went through the pasture to and from their work.

Plaintiff's evidence also tended to show that neither the owner nor the care-taker ever objected to this use on the part of the public, except to the use of the swimming hole in the daytime. That there were no signs or other

warnings against the public using the property until after the accident occurred.

The defendant's electric wires extended from its pole line on Kentucky Avenue north through the pasture near its east line to and beyond the place where plaintiff was injured. It supplied the two houses on the McElroy farm with electricity, as well as some other houses between Kentucky Avenue and Pacific Street, including the plaintiff's father's house. The electric wires had been there for a number of years. About four years before the trial, the wires were insulated, but the insulated wires were taken down about that time, and bare copper wires were put up in their place and were there when the accident occurred. Defendant's employees patrolled the line from time to time prior to plaintiff's injury.

The walnut tree in which plaintiff was injured was about six inches in diameter at the bottom and twenty-five feet high. It was about three inches in diameter at eighteen or twenty feet from the ground where plaintiff was injured. The wires of the defendant passed through the tree at the place where plaintiff was when injured, about twenty-seven inches from its trunk. There were limbs above and below the wires. Also, little stubs of limbs which had been cut off about two, four and six feet from the ground. The wires were about the size of a lead pencil. There was a pole about eight feet north and another about one-hundred and fifty feet south of the tree, on which these wires were strung; they were twenty-five-foot poles, about five feet thereof being in the ground. Defendant's electric wires on Kentucky Avenue were insulated. The bare wires started from plaintiff's father's house running north. Four or five other houses were supplied from these bare wires.

The boys had gathered walnuts in this walnut grove for several years before the accident; men and boys gathered them. The limbs on the tree in which the plaintiff was injured extended out about four or five feet from the trunk, and about six feet above the wires. If the

wires had been placed six feet higher than they were, or six feet west, or ten feet east of the body of the tree, they would have cleared the tree. There was a path about twenty-five feet from the tree which had been made by the Standard Oil Company's employees going to and from their work.

Plaintiff testified: That he had lived with his parents on Poplar and Felton avenues (about a block and a-half south of the southeast corner of said McElroy's pasture) for six years before the trial. That he had gone to the pasture to take the cow and heifers there, get walnuts, flowers and pawpaws, and play various games, and to go swimming and fishing in the pond, ever since they had lived there. Sometimes he would go through the gates and sometimes through or over or under the fence.

The morning of his injury, he and his brother, Fred, and his two cousins, Richard Beddell and George Brundage, and Jimmie Wilson, took the cow over to the pasture, and then went to get walnuts. It was in August; the leaves on the trees were green. They went to this clump of walnut trees on the east side of the pasture. Plaintiff climbed up one tree and knocked a lot of walnuts down, and as he came down he touched a wire and saw a flash and received a shock and lost consciousness, which he did not regain until he woke up at home in bed. He knew nothing about electricity. Had gathered walnuts in that pasture before, but not in that particular tree. Did not see or know the wires were in the tree.

On cross-examination, he said: He would be fourteen years old his next birthday, August 5, 1921. He got up about fifteen or twenty feet in the tree and then started down. His foot did not slip until after he touched the wire. He caught it with his left hand first, and then he slipped. His face was burned when he was unconscious. Could not tell which limb he was on. He was on a limb, and in getting down, grabbed the wire with his left hand, did not know it was there, the leaves covered it over, and he didn't even see the wire nor anything else. He was

299 Mo.—31.

coming down taking hold of one limb and then the other, and touched the wire with his left hand. The care-taker, Mr. Platt, never told him to keep out of the pasture, except to keep out of the swimming hole until after six o'clock.

Plaintiff's evidence further tended to show that the wires, although carrying 2300 volts, could have been insulated where they passed through the tree, so as to render them harmless. They could also have been isolated by carrying them over the top of the tree on 45-foot poles, instead of using 25-foot poles, as was done at that place. Or the pole-line could have been moved away from the tree. This would have been good electrical practice.

Defendant's evidence tended to prove: That the owners of the McElroy property consented to the use of the property for school, church and lodge picnics, and by people whom they thought would do no injury to the property, but not to its use by the public generally without permission. Mr. McElroy himself testified he saw children gathering walnuts at different times, but did not molest or prevent them from so doing. That he himself never ordered anybody off of the place, although he saw many children and people there. He had told his care-taker to permit certain parties to use the pasture, and had assumed they received permission from him. He supposed these were people and children of people that bought houses and lots in Jackson Lithia Place—people he knew.

Defendant's evidence further tended to show: That for many years before the accident to plaintiff, numerous signs had been posted around, especially in the part of the pasture fronting on Pacific Street, warning trespassers to keep off. But these signs were constantly being destroyed by the boys and others using the pasture. The boys had been expressly prohibited and warned against using the pond for a swimming hole, but notwithstanding they used it so much that they "whetted" the top of the dam down at one place from eight or ten

feet in width to eighteen inches. That they were in swimming every day in the summer time—they could not keep them out. That the care-taker had expressly warned the plaintiff to keep out of the pasture.

Defendant's evidence also tended to show: That wires were not customarily insulated outside of cities in such places as this pasture, nor were they ever insulated where they went through trees with a view to protecting children who might climb such trees. Furthermore, that no insulation was much protection against the high voltage, 2300 volts, carried by these wires. But defendant's evidence showed that the use of forty-five-foot poles would have completely isolated the wires by putting them over the top of this tree.

Evidence of plaintiff as to his injuries: His father was notified of his fall from the tree, and carried him home in his arms; he was unconscious, limp like a dead boy. His hands and face were all burned black, and smelled as though burned. Hands were burned through and across the palm to the bone near the base of the fingers; right ear burned. Was treated at home for about three weeks, then taken to the hospital where he remained five or six weeks. His eye was blackened and swollen shut and inflamed and remained so for some time. At the hospital, he underwent three operations, involving skin grafting, skin being removed from his shoulders and hips, and grafted upon his face and hands; he was under an anaesthetic more than an hour each time, and twenty to thirty small pieces of skin were taken from him and grafted each time. At the time of the trial, there was a heavy scar on the right cheek "quite bright red," over which the beard will never grow and which will disfigure him. This scar extends from a point below the eye over to the muscles that go into the ear, and when he opens his mouth or talks there is an involuntary twitching of the face. The "smile muscle" is so affected that, when he attempts to smile, his mouth twists instead. This condition is permanent. Before the

injury, the plaintiff was a strong, healthy and robust boy; since then, he has been very nervous, fidgety, easy to cry, does not sleep well, and apparently stunted in his growth. His left hand is some smaller than his right, the use of it is somewhat impaired. His eyes were also affected, so that he has had to take treatment from an occulist, who testified that he will always have to wear glasses, as his vision is impaired in both eyes from the inflamation that was caused by his injury. He also has a constant squinting or blinking of the eyes. His eyes still hurt him about all of the time. The circulation and strength of his left arm and hand are impaired. His parents have to cut and prepare his food for him at the table. His central nervous system was upset by the shock and injury he received.

Defendant's evidence, as to plaintiff's injury: Plaintiff on cross-examination, testified, among other things, that, since the accident, he had been over in the McElroy pasture climbing trees. He saw a play, after his injury, in which one of the characters, Tarzan, jumped from tree to tree like a monkey. The next day the boys were playing "Tarzan" in the pasture. They would jump from one tree to another, but he wouldn't jump, he would bend the tree over and hold on to one tree until he got to the other, about like Tarzan did in the play. This was two or three weeks before the trial. The Sunday before that, he was over in the pasture, where the boys were digging a cave; they did not climb trees that day, but played another game. The trees they bent over in playing "Tarzan" would be small trees five or ten feet high, not as tall as the room. He held on the best he could with his left hand as well as his right. He is not as strong in his left as he is in his right hand; could not hold his weight by his left hand.

The medical testimony of the defendant was to the effect that plaintiff's injuries were superficial, and not of a permanent character, except that two scars on the side of his face extending to under the right ear are in a

measure permanent, and the lobe of the ear has been burned so that it has been separated from the face for a distance of possibly an eighth of an inch. There is no indication of the impairment of the muscles of his face or hands. The scars on the left hand at the base of the fingers extending clear across the palm of the hand will be permanent; all these scars will improve to a certain extent, but will not be totally obliterated. The boy does not appear to be up to the standard in growth and size for his age.

At the close of the testimony the defendant offered and the court refused a peremptory instruction to find for the defendant; also gave certain instructions for the plaintiff. There were also certain objections to testimony, of which defendant complains, and which will be noticed later on in the opinion.

There was a verdict for the plaintiff for $20,000. Defendant duly brought the case here by appeal.

I. It is well settled that an electrical company, "if reasonably chargeable with knowledge, or of facts making it reasonably probable, that persons may lawfully come into close proximity to its wires for purposes of either business or pleasure, is obligated 'to use every precaution which was accessible to insulate its wires' at such places and to use the utmost care to keep them so." [Williams v. Gas & Elec. Co., 274 Mo. 8; Geismann v. Electric Co., 173 Mo. 674; Von Trebra v. Gas Co., 209 Mo. 659; Clark v. Railroad, 234 Mo. 419; Campbell v. United Rys. Co., 243 Mo. 152; Sudmeyer v. United Rys. Co., 228 S. W. 64.]

*Uninsulated Electric Wires.*

II. It is also well established law, that electric companies must take notice of the natural instinct of boys to climb trees— especially trees which bear nuts or fruit —and if they string wires through such trees under circumstances which may reasonably charge them with notice of the probability of boys climbing such trees, and a boy who

*Boys: Climbing Tree: Notice.*

has climbed a tree to get· the nuts or fruit—or even to satisfy his childish instinct to climb trees—is injured by an uninsulated or dangerous wire, without contributory negligence, the company must respond in damages. [Williams v. Gas & Elec. Co., 274 Mo. 1; Kribs v. Jefferson City Light: Co., (injury to boy in pasture), 199 S. W. (Mo. App.) 261; Thompson v. Slater (injury to boy in tree), 197 Mo. App. 247; Temple v. Electric Co., 89 Miss. 1, and many cases from other jurisdictions cited by this court in the Williams Case, supra, at page 9.]

This is the general law. In Curtis on the Law of Electricity, section 512, it is thus stated: "An electric company, maintaining a dangerous wire through or near a tree, is bound to anticipate that persons may lawfully climb the tree, and it is required to exercise due care to prevent injury to such persons from its wire. . . . The courts recognize that children are apt to climb trees, and impose upon electric companies the burden of using due care to keep their high-tension wires insulated in places where children when climbing a tree will come in contact with them."

III. It is also the rule in this State, that the fact, if it were a fact, that the injured child was trespassing upon a third party's property at the time of the injury, is no defense. [Williams v. Gas & Electric Co., 274 Mo. 1, supra, and cases cited p. 11.]

**Trespasser.**

IV. It is true that, in this case, the place where plaintiff was injured was not within the technical corporate limits of any municipality; but it was close both to Kansas City and the town of Sugar Creek, and bordered upon Jackson Lithia Place, which was thickly settled. Said pasture, according to plaintiff's evidence, had for a number of years been a playground for children, and the walnut tree, through which defendant ran its deadly uninsulated wires, was in a little grove of walnut trees, which for a number of years before plaintiff was injured had been

**Anticipating Injury: Pasture.**

climbed by children to secure the coveted walnuts—with none to molest or make them afraid. Under the law in this State requiring the utmost care of electrical companies to make and keep their wires safe so as not to unnecessarily destroy human life or limb in the operation of their exceedingly dangerous but necessary business, it was the duty of defendant, under plaintiff's evidence, to reasonably have anticipated the presence of the plaintiff in the tree in which he was injured, and to protect him by properly insulated or isolated wires, and failing to do so was liable for his injury, unless absolved therefrom by plaintiff's contributory negligence. [Authorities, supra.] But we hold that plaintiff was not guilty of such contributory negligence, as a matter of law. Defendant's demurrer to the evidence was therefore properly overruled.

V. Nor are defendant's objections to instruction numbered (one) given for plaintiff tenable. There was evidence (contrary to defendant's contention) that, for a number of years before the accident, children had climbed and gathered walnuts from these walnut trees, which would include the tree in question, and that it was reasonably probable that they would come in contact with said wire, located, as it was, in said tree. Nor did said instruction (as contended by defendant) make it the absolute duty of defendant to insulate its wire and make it harmless, but only to do so if said wire "by the use of ordinary care could have been insulated and made harmless . . . and to use the utmost care to keep it insulated."

*Instruction: Absolute Duty.*

Nor was said instruction erroneous, because it permitted a finding for plaintiff, ignoring the issue of contributory negligence. Said instruction expressly required the jury to find that plaintiff "while in said tree, and at all times mentioned in the evidence, was not guilty of any contributory negligence." Nor did said instruction enlarge the issues, because the petition alleged the plaintiff "did not know of the danger created by said wire."

His knowledge in that regard was an element of contributory negligence which the jury was required to pass upon.

VI.   Plaintiff's instruction numbered 2 was not erroneous.   This instruction defined ordinary care. in the usual way.   It defined the term "utmost care" as "such care as would usually be exercised by ordinarily careful and prudent persons engaged in the same or Utmost Care: similar business under the same or similar Definition. circumstances to those shown in evidence, and any failure, if any, to exercise such care is negligence." We see no objection to this instruction of which defendant could complain.   If objectionable at all, it is because it is too favorable to the defendant.

VII.   Plaintiff's instruction numbered 3 was an instruction on contributory negligence.   Defendant's objection thereto is, that it had no place in the controversy, because the plaintiff was either guilty of contributory negligence as a matter of law, or not at all.   We Contributory see no substance to this objection.   Defendant Negligence. expressly pleaded contributory negligence and although there may have been no evidence at all to sustain this plea, it cannot complain of said instruction for that reason.

VIII.   Defendant's objections to evidence are untenable.   It objected to a great many questions concerning the strength and health and disposition of the plaintiff before and after the accident, such as, that he Short-hand was perfectly well and healthy, playful and Statement of Facts. cheerful before, and afterwards, he was not very active, nor very playful, and would cry easily, and the like.   We see no objection to such testimony.   It was admissible as a short-hand statement of facts.   [Parker v. Ins. Co., 289 Mo. 42; Rearden v. Railroad, 215 Mo. 137]

Nor was it error to permit the plaintiff to stand near the jury, while plaintiff's physician was testifying to and describing plaintiff's injury. That was a matter within the discretion of the lower court. Nor can defendant charge the court with error in permitting certain leading questions. Leading questions are also largely within the discretion of the trial court, and we cannot find the court abused its discretion.

Standing Near Jury.

IX. As to the amount of the verdict: The verdict was for $20,000. We are satisfied that the plaintiff was seriously injured, but we deem the amount more than the general precedents in such cases in this court will allow to stand. Our conclusion in that regard is, that if the plaintiff will remit $5,000 from the judgment within ten days after our opinion in this cause is filed with the clerk of this court, the judgment below will be affirmed for the sum of $15,000, with interest at the rate of six per cent per annum from the date it was originally entered in the circuit court; otherwise, the judgment will be reversed and the cause remanded for another trial. *Lindsay, C.,* concurs; *Brown, C.,* not sitting.

Excessive Verdict.

PER CURIAM IN BANC:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. *Ragland, White, Walker* and *James T. Blair, JJ.,* concurs; *Graves, J.,* dissents in separate opinion, in which *Woodson, C. J.,* concurs; *David E. Blair, J.,* dissents.

JAMES T. BLAIR, J. (concurring).—This case was brought, tried in the circuit court, appealed, briefed and argued and decided in this court on the theory that the foundation of the action was appellant's neglect of duty in maintaining an uninsulated wire in a place where it reasonably ought to have anticipated the lawful presence of persons who might "come into close proximity to its wires for purposes of either business or pleasure." At

least as late as the oral argument in Division it had not occurred to counsel to suggest that this case in any way depended upon the ''attractive nuisance doctrine.'' In its original brief (pp. 14, 15) appellant summarizes the petition and answers as follows:

''The petition states that on the 10th day of August, 1919, appellant was engaged in manufacturing and distributing electrical current and maintained an electric wire carrying a high and dangerous amount of electricity; that the wire passed over what is known as 'McElroy Place;' that the place was much frequented by children; that it was the custom of children to play thereon; that there were several nut-bearing trees thereon; that it was the custom of the children to climb to gather nuts in the season; that the electric wire ran through and against the branches and foliage of one of said trees and near to the trunk of the same; that the wire was uninsulated and carried a dangerous and deadly current of electricity; that the tree was a walnut tree, twenty-five feet in height, with the lower branches fifteen or sixteen feet from the level of the green surrounding the same; that the tree was a small tree, and easy for boys of ten years to climb; that the wires were so located in the tree that anyone climbing therein would be likely to come in contact therewith; that boys were accustomed to climbing said tree and that said facts were known to appellant at the time of the construction of said wire, or would have been known by the exercise of ordinary care; that appellant carelessly and negligently so constructed said wire and knew of said facts in time by the exercise of the highest degree of care to have remedied the condition and averted the injury to respondent; that on the 10th day of August, 1919, he climbed the tree for the purpose of picking nuts, not knowing the danger created by the wire, and whilst climbing in said tree, came in contact with the wire, or received a shock from said wire through the escape of electricity into the limb of the tree; that by reason of said coming into contact with the wire or re-

ceiving into his body a current escaping from the wire, he was rendered unconscious and injured, etc.

"The negligence charged against appellant is 'that it carelessly and negligently so constructed said wire' with knowledge of the facts aforesaid it had time by the exercise of the highest degree of care to have remedied the same, which it carelessly and negligently failed to do."

"The answer denies the allegations of the petition and pleads contributory negligence."

After epitomizing the evidence, counsel insist: (1) That appellant was not negligent because, in the circumstances shown, it did not appear it ought to have anticipated the presence of any one in the tree, and (2) because respondent was a mere licensee. The insistence was that there was no showing of facts that imposed a duty to anticipate the presence of any one in the tree and guard against the injury. Counsel distinguished the Williams Case on the ground that the wire in that case was maintained through a tree in a populous city. No case cited or argument made in that brief indicates that counsel had any idea that the attractive-nuisance or turntable doctrince was at all involved. That able and seasoned counsel for appellant did not discover the present theory on the trial, nor until after an adverse opinion in Division, is worthy of note. The theory was not advanced within the time fixed by the rules for new assignments of error in Banc after transfer and, under numerous rulings, is not before the court for that reason. Nevertheless, new briefs raise the point, though out of time, and the dissent is founded upon it.

The attractive nuisance doctrine is not involved in this case. The land was not that of appellant, but was owned by a gentleman who had for many years permitted its habitual use by large numbers of persons, including church, lodge and school picnic parties and other groups, as well as individuals. The evidence tended to prove that it was a veritable playground. There was a pond in which

the children swam. There were walnut trees from which they gathered nuts. There were wild flowers in profusion, and they gathered these. These things may account for the presence of the children, but no injury came from them. They made the place a playground—with the owner's consent. In this situation appellant sometime ago took down its insulated wire and stretched an uninsulated wire through the walnut trees. These trees were of a kind easy to climb. In view of the propensity of boys to climb, this imposed the duty to anticipate the presence of boys in the trees and probable injury to some of them from a wire like that appellant installed. If appellant had stretched its live wire around a party of picnicing children then in the pasture and one was hurt by it, would it be an answer to say: "The children were attracted to the place by the pond, the trees, the flowers, the grass, the sun; since they were *attracted* to the place, the turn-table doctrine applies to them; we are not extending that doctrine; therefore, there can be no recovery?" This is essentially what is held in the dissenting opinion, in principle. The children were there. What brought them there, in view of the long and general use, with the owner's consent, is no concern of appellant. Through a place, a tree, where it was practically inevitable boys would go, appellant put up its uninsulated wire and maintained it there. To say it should not have anticipated that boys would climb trees in their playground like those described, is for court and counsel to forget their own boyhood and all their later experience with children and deny the existence of an obvious natural instinct. Unless that be denied, appellant ought to have expected the boys, who were allowed to frequent the place, to climb the trees and should have taken precautions accordingly. Thus charged with notice of the probable presence of boys in the trees, it was negligence to string and maintain this heavily charged uninsulated wire through the branches. This is an ordinary case of negligent failure to take due precaution to prevent in-

jury from a dangerous agency to those whose lawful presence in the place where it is installed and maintained is a reasonable probability. In circumstances like those in this case recovery is allowed even by courts which deny outright the validity of the whole attractive-nuisance or turn-table doctrine. [Guinn v. D. & A. Tel. Co., 72 N. J. L. 276.] That doctrine has to do, mainly, with questions of trespass, invitation and notice. It begins with the ordinary rules of negligence, and works to an answer to the defense of trespass and to the claim that there was no duty to anticipate the presence of children. The lure of the turn-table is said to constitute an invitation. There is not an element in this case dependent upon that doctrine, as a statement of it shows. The quotation from the petition in the dissenting opinion shows merely that the pleader described the tree as one easy to climb. This was pertinent to the duty of appellant to expect the presence of boys in the trees, in following their natural tendencies. The instruction submitted nothing more. If the trees had been such that boys could not climb them, and every boy has found trees of that kind, that would have been proper matter in refutation of the charge that it was appellant's duty to expect them to climb the trees. Both the allegation and the instruction were in accord with the trial theory of counsel on both sides, and of the theory of the opinion of SMALL, C.

What has been said applies to the remark in the dissenting opinion in regard to the Williams Case and the Temple Case. That the pleader in the Williams Case, after stating a cause of action on the true theory, incorporated in his allegation the word "attractive" could not, of itself, render applicable a doctrine wholly foreign to the real case pleaded. To say that children are attracted to a tree and "did play there" is only to say that their presence there for purposes of pleasure was to be anticipated. The majority opinion in the Williams Case, 187 S. W. l. c. 557, which is now approved in the dissenting opinion, expressly held that the attractive nuisance

doctrine was wholly inapplicable to the facts. Considerable discussion is devoted to the point. Kelly v. Benas is there cited and discussed. The case was decided in the Court of Appeals, as it was here, on the rule of negligence applicable to the facts. It seems clear that the use of the word "attractive" in the petition in the Williams Case and in the opinion in the Temple Case is the single ground for the attempted application of the turntable doctrine to this case. The oft approved rule in Geismann v. Electric Co., 173 Mo. l. c. 674, and like cases, in so far as it applies to persons lawfully in a place for purposes of pleasure, must go by the board if the fact that one is "attracted" to the place is always to be a defense to a charge of negligence in maintaining electric wires. This is the gist of the dissent.

· The implication in the dissent that the court was not fully advised of the real situation in the Williams Case, disappears unless the turn-table doctrine was the foundation of that case. Since that doctrine had nothing to do with it, the complaint is simply that the court failed to decide that case on a doctrine which was quite without application to it and whose application had been expressly and correctly denied in the court from which the cause was transferred—the opinion in which is now approved in the dissent in this case as it was approved, except on its view of certain facts, in the opinion here. [274 Mo. l. c. 8, 9.]

The instant case is well decided. *Ragland, J.,* concurs.

GRAVES, J. (dissenting).—With no special desire to resurrect burnt ashes, but with a desire to dissent in this case for reasons apparent upon this record, we wish to make mention of Williams v. Gas & Elec. Co., 274 Mo. 1, and Williams v. Gas & Elec. Co., 187 S. W. 556. The latter is the Court of Appeals' opinion. Upon more mature reflection, I think that the case at bar is clearly distinguishable in facts. There is a vast difference between

stretching uninsulated wires in a thickly populated city, and stretching them through a 205-acre pasture.

Our opinion in the Williams Case, 274 Mo. 1, supra, does not mention or discuss the ''Attractive Nuisance'' as a theory in the case. Reading our opinion one would not know that the plaintiff's theory of recovery was based upon that theory. Going back to the old files we find the following in plaintiff's petition:

''Plaintiff further says that defendant's said electric light wires extended through the branches of said tree and were concealed by its foliage, and that said wires carrying a voltage of electricity deadly to human life were not sufficiently nor properly nor carefully insulated, nor covered nor protected, and that the defendant negligently and unlawfully operated the said wires within a foot of and dangerously and unlawfully near the said platform and the said house in the condition aforesaid; and that on May 9, 1915, the defendant knew of the said dangerous condition of its said wires, or by the exercise of ordinary care could have known that its said wires were uncovered, uninsulated and unprotected in time to have properly and safely insulated them before plaintiff's injury therefrom; *and that on and prior to May 9, 1915, the defendant knew or by the exercise of ordinary care, could have known, that the said house and the said tree were attractive to children to play and that children did play there.*''

The italics are ours. Our opinion is bottomed upon a theory of negligence independent and distinct from the doctrine of the attractive nuisance. Had our opinion discussed the doctrine of attractive nuisance, it would have been in line with plaintiff's petition, and would have been at once noted by members of the court. But the case is so clearly distinguishable from the case at bar, that we need not discuss it further, than to say that we believe the majority opinion of the Court of Appeals is correct. First, because the plaintiff having planted his right to recover upon that character of negligence denominated

the "attractive nuisance," and secondly because the Temple Case, 89 Miss. 1, is an attractive nuisance case, and in adopting its theory of attractive nuisance, Division One of this court in the Williams Case, supra, contravened many Missouri cases without even mentioning them, or mentioning the fact that the petition in the case invoked the doctrine of attractive-nuisance cases. The reporter so considered the Temple Case, when he wrote:

"An electric light company is liable for injuries sustained by a child who climbed into a tree through the branches of which its uninsulated wire, causing the injury, extended, where the branches were so located as to be attractive to children and provoke their instinct to climb."

The reporter of the court took this practically from the opinion, wherein WHITFIELD, J., speaking of the complaint or petition in that case said, at page 7:

"The declaration shows that the tree in which this boy was injured, by contact with an uninsulated wire, was an oak tree, a little tree abounding in branches extending almost to the ground—just such a tree as the small boys of any community would be *attracted to,* and use, in their play."

So that in our opinion (274 Mo. 1) we have adopted from Mississippi, a doctrine of the "attractive-nuisance" or "turn-table" rule which has been condemned by a long line of our cases. This court has, both in Division and In Banc, refused to extend the rule.

I. In Kelly v. Benas, 217 Mo. 1, l. c. 13, is a review of all previous cases. In this case LAMM, P. J., sounded the warning against such a rule as is adopted in the Temple Case in Mississippi, in this language:

"If the old channel of the law is to be quite changed by the application of the new doctrine automatically and without discrimination, if sentimental considerations (however elevated and tender) are to usurp the place of cold and calm reason as the foundation for rules of law, then the floodgate now damming back liability will be

raised letting in strange and deep waters for the land-owner to struggle with. Not only will he be liable for boys drowned while swimming in his stock pond (the idea of swimming being alluring to a boy), for those who fall into uncovered wells, cisterns and cellars (the notion of playing on the brink of such being a boyish one), for children who are suffocated while playing in piles of sand accumulated for building purposes or in sliding down stacks of straw unscientifically piled and exposed, but he may be mulcted in damages for injuries to his neighbors' children, who, romping in his haymow, without his invitation, break their bones by sliding down his hay chute, or those who, playing in his rock quarry, are hurt. Shall he fence against adventurous, trespassing boys? Almost as well suggest 'that he build a wall against birds.' If he is held to liability for injury to the children of Jones because of the way he piles his lumber, by the same token, as to Brown, liability would be fastened on him for the way he piles his stones, his bricks, his corn in pens, his hay ricks and his cord wood on his private grounds—in fact, as has been pointedly said, every landowner will be liable for injuries to his neighbor's children under the new doctrine *except the neighbor himself.* We cannot well write the law that way.''

This court, in both Divisions, has observed this warning since the Kelly Case, as we had with one or two exceptions prior thereto. We have turned our face against extending the attractive-nuisance doctrine. The more recent ones we cite. Others will be found cited therein.

By Court in Banc: Rallo v. Heman Construction Co., 291 Mo. 221, l. c. 226; State ex rel. v. Ellison, 281 Mo. l. c. 671. By Division One: Kelly v. Benas, 217 Mo. 1; O'Hara v. Gas Light Co., 244 Mo. l. c. 405. By Division Two: Buddy v. Railroad, 276 Mo. l. c. 284 and 288.

II. The foregoing suffices for the Williams Case. The present case is so different in evidential facts and

299 Mo.—32.

the place of accident, that we need not have mentioned the Williams Case at all had it not adopted the views of another state upon the "turn-table or attractive-nuisance cases" which contravenes such a long line of Missouri cases. The states are divided upon the "turn-table" rule, (1) some refuse to recognize it at all (2) some recognize it to a limited extent—Missouri is in this class —and (3) others have extended it to very wide limits, of which latter class is the State of Mississippi, from whence comes the Temple Case.

In Law Series 26, p. 32, the Bar Bulletin of the University of Missouri, will be found a collection of cases of interest, showing the three classifications of the states.

In its very latest case the United States Supreme Court has adopted the limited application of the "turn-table" or "attractive-nuisance" rule. [New York, N. H. & H. Ry. Co. v. Fruchter, 43 Sup. Ct. Rep. 38.] In this case, Fruchter, a boy of eight years climbed up the trestle work of a bridge and came in contact with an uninsulated wire of the defendant. The construction of the bridge was such as to tempt boys to climb thereupon. In both the United States District Court and United States Court of Appeals, the recovery was allowed on the "attractive-nuisance" theory or "turn-table" rule. [271 Fed. 419.] This doctrine the United States Supreme Court repudiated, as indicated above in an opinion by Justice McReynolds, cited, supra.

In the instant case the petition is predicated upon the turn-table or attractive-nuisance doctrine. In the petition it is said:

"That said electrical wire ran through and against the branches and foliage of one of said trees hereinafter described and near to the trunk of same; that said wire was uninsulated and carried a dangerous and deadly current of electricity; *that said tree was a walnut tree some twenty-five feet in height, standing in a ditch or depression, so that the lower branches of said tree were fifteen or sixteen feet from the level of said green im-*

*mediately surrounding said tree; that said tree was a small tree and grew at an angle with its base, and in its growth had thrown out numerous crotches, so that said tree was very easy for boys, even of tender years, to climb,* and that said wire was so located in said tree that anyone climbing into said tree would be likely to come in contact therewith.''

Here we have all the facts of an attractive nuisance. This doctrine was submitted in the instruction thus:

''And that said tree was a small nut-bearing tree and grew in an angling or leaning position, and had low and numerous crotches, and was very easy for boys of tender years to climb, if so,'' etc.

The case was both pleaded and submitted on the attractive-nuisance theory by the plaintiff. On that theory he cannot recover under the line of cases cited above. It is an extension of the turn-table doctrine, against which this court has turned its face. The majority opinion in Paragraph one, rests upon the Williams and Temple cases, among others, so that it, like the Williams Case, rests upon an extension of the ''turn-table'' or ''attractive-nuisance'' doctrine. We cannot sustain the majority opinion without overruling the cases we have cited, supra, and the long list of cases in them cited.

Whether this case can be approached from any actionable angle is a question we need not speculate upon at this time. Pleadings and instructions would have to be redrafted. If it be not an attractive-nuisance case the deadly earmarks should be taken from the petition and instruction. Personally the writer thinks no case can be made, but this is not necessary in this dissent. For the views above stated I dissent. *Woodson, C. J.,* concurs.