George T. FOOTE, Jr., and Lila P. Foote, Plaintiffs-Respondents,

v.

SCOTT–NEW MADRID–MISSISSIPPI ELECTRIC COOPERATIVE, a corporation, Defendant-Appellant.

No. 8004.

Springfield Court of Appeals. Missouri.

July 10, 1962.

Motions for Rehearing or to Transfer Overruled July 31, 1962.

Blanton & Blanton, Sikeston, for defendant-appellant.

Frederick E. Steck, Sikeston, for plaintiffs-respondents.

STONE, Judge.

For the alleged wrongful death of their unmarried minor son, George T. Foote, III (hereinafter called George), his parents, as plaintiffs, sued Scott-New Madrid-Mississippi Electric Cooperative, as defendant, and upon trial obtained a jury verdict for $8,000. From the judgment entered thereon, defendant appeals. Its primary complaint that the trial court erred in overruling defendant's motion for a directed verdict at the close of all of the evidence requires a factual review, in which we should and do give appropriate recognition to the basic principle that, in determining whether a submissible case was made, we must consider the evidence in the light most favorable to plaintiffs, must accord to them the benefit of all supporting inferences fairly and reasonably deducible from the evidence, and must disregard defendant's evidence except insofar as it may aid plaintiffs' case. Daniels v. Smith, Mo., 323 S.W.2d 705, 706(2); Phillips v. Stockman, Mo.App., 351 S.W.2d 464, 471(7); Hildreth v. Key, Mo.App., 341 S.W.2d 601, 604(2)

When death by electrocution suddenly struck George in the front yard of his farm home on the afternoon of Sunday, January 3, 1960, he was exactly sixteen years seven months of age, approximately five feet nine inches in height, and about 165 to 175 pounds in weight. He had completed his freshman year in the Sikeston High School and had quit voluntarily during his sophomore year on October 29, 1959. Both his classmate, Dewey Holmes, and his father said that George was a boy of normal intelligence, and several farmer witnesses supported plaintiffs' testimony that George was "all the way around a good hand on the farm," had operated tractors and mechanized farm machinery not only on plaintiffs' farm but also for hire on neighboring farms, and in short could do and had done "a man's work."

The farm home, in which George lived with his parents and other members of the family, was situate on the west side of a graveled north-and-south public country road near Sikeston. Running parallel with, near to, but inside (i. e., east of) the west right of way line of the public road was defendant's north-and-south single phase, 7200 volt, electric transmission line carried overhead on wooden poles. There were two wires in this transmission line, towit, (1) the *energized* or "hot" wire carrying 7200 volts which was attached to the top of the poles and (as stipulated by the parties) was 25½ feet above the ground, and (2) the *unenergized* neutral wire carrying no voltage which was attached to the poles 4 feet below the energized wire and thus was 21½ feet above the ground. Several feet below the unenergized neutral wire, crossarms carrying two telephone wires were attached to the pole line. The only wire figuring in the tragedy under consideration was the energized wire 25½ feet above the ground which was a bare, uninsulated copperweld wire. Although we recognize that the National Electrical Safety Code fixes and promulgates only minimum standards, compliance with which may not, in all circumstances, establish freedom from negligence [Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510, 515], it was in evidence that the Safety Code required a minimum clearance of 18 feet for 7200 volt rural lines. Admittedly, there were no warning signs on or about the poles, and nothing indicated the voltage transmitted over the line.

Plaintiffs' witnesses variously estimated that the front of the Foote farm home was from 50 to 100 feet west of defendant's north-and-south transmission line. Three medium-sized shade trees (at that season

of the year without foliage) stood in the front yard between plaintiffs' home and the transmission line, but the undisputed evidence clearly established that none of the wires ran through or near any of the trees and that the wires were in the open and plainly visible from the ground. With respect to the appearance of the electric wires, George's father testified that "they were up there in the air; you can't see what they look like too much"—"they are of a black color, grayish black color." When asked whether he could determine from the ground if the wires were insulated, he first answered that "I couldn't say because I really don't know, but they appear to be insulated." However, he shortly explained that, if "you just set down there and eye-balled them for quite a while, you probably could tell they wasn't insulated." George's mother stated that she could not tell whether the wires were insulated, and that she did not know their color "but they look dark." Plaintiffs' witness, Dewey Holmes, said that these wires were "the same color as any ordinary wire, sort of a dull looking color." In any event, they had been in the same location since plaintiffs had built the Foote farm home almost sixteen years prior to the tragedy in suit; and during the same period the Foote family had been supplied with electric service from this transmission line and had operated in their home numerous electric appliances which, in our materialistic abundance, we have come to regard (in the words of George's mother) as "common things like a washing machine, a deep freeze and an ice box and an iron and television."

Early on the fateful Sunday afternoon of George's accident, Dewey Holmes, a neighbor youth also sixteen years of age, came to the Foote home in a pickup truck which he parked, headed south, on the west side of the road in front of the house. Dewey described the day as "pretty warm" with "a pretty strong wind blowing out of the west and a little bit southwest"—it was "gusty." After the two youths had passed some time in innocent pursuits such as walking around the barn and hunting Indian arrowheads in a sandhill, they found some copper wire and two tin cans in a trash barrel, tied the ends of the wire through holes punched in the bottom of the cans, and thus "made a sort of a telephone thing" to talk through. We observe parenthetically that Gary, George's younger brother, testified that, before this copper wire had been thrown in the trash barrel, George had kept it in his room for use in "something for the school bell" which, with the aid of batteries, he had intended to make. Returning to the activities of the tragic Sunday afternoon, plaintiffs' evidence was that George and Dewey talked over their improvised can and copper wire telephone line "for a little while in the back of the (Foote) house and then . . . went around (to) the front" where they simply stood and talked for a few minutes without using the "telephone." Then Dewey got into the parked truck, put one end of the copper wire with a can on it through the open right-hand or west window of the truck, rolled "the window up on the wire and talked through it like that for a little while" until the wire broke right at the truck window.

This left Dewey with only an inch or so of wire inside the window, and George had the remainder of the wire (no one estimated its length) with the can on his end of it. George began to swing the can "in a circle," holding the copper wire in his left hand about ten inches (as Gary thought) or about eighteen inches (as Dewey estimated) from the can. As he swung the can, George was facing north and was standing in (but near the edge of) his front yard at a point some four or five feet west of the overhead transmission line and about twenty feet south of the nearest pole. The only two eyewitnesses, Gary Foote and Dewey Holmes, agreed that, while thus swinging the can around, George received no electrical shock and the can was not close to the energized top wire. Suddenly and without saying anything, George "let go of it" (as Gary said) or "he either let go of it or it slipped out of

his hand—I don't know" (as Dewey related it). In either event, the can went over the energized top wire, and the deadly current, always seeking a route to the ground, found it through the copper wire and George's body. He turned around and immediately fell on his stomach to the south. The only thing the stricken youth said before expiring was the warning "Dewey, don't touch me; I have been electrocuted."

■ Many distinguished jurists have, over the years, written with feeling and fervor concerning the force known as electricity, vividly and vigorously but aptly and appropriately characterizing it in nature and effect as dangerous and deadly, invisible and insidious, lurking and lethal, mysterious and murderous, odorless and ominous, and sightless and sinister. With electricity being all of that and more to those unschooled and untrained in its properties and behavior, certainly it is both fitting and necessary that those generating, transmitting or distributing such force should be obligated by law, as they are, to exercise care commensurate with the nature and effect of that force and the danger and hazard incident thereto. Gellert v. Missouri Service Co., Mo., 221 S.W.2d 177, 179; 29 C.J.S. Electricity § 39, p. 575; 18 Am.Jur., Electricity, § 48, loc. cit. 444. But, although the judicial declarations in this jurisdiction have

firmly fixed and uniformly adhered to the utmost or highest degree of care as the required standard, it is perfectly plain that here,[1] as elsewhere [29 C.J.S. Electricity § 38, p. 573], an electric company is not an insurer of the safety of persons and property, and that its liability vel non in a given situation is determinable upon principles of negligence.

■ Even as in other areas "(m)ost duties, imposed by the law of torts, arise out of circumstances and are based on 'foreseeability' or reasonable anticipation that harm or injury is a likely result of acts or omissions,"[2] it has been held specifically that, in actions of this character, "'(a)nticipation' or 'foreseeability' is an essential element in determining negligence" [Gladden, supra, 277 S.W.2d loc. cit. 519(10)] and all of our Missouri cases in this general category so recognize either expressly or by necessary implication.[3] Thus, an electric company is obligated to employ the highest degree of care either to insulate its transmission lines adequately or to isolate them effectively wherever, in the exercise of such degree of care, it reasonably may be anticipated that others, whether for business or pleasure, lawfully may come into close proximity to such lines and thereby may be subjected to a reasonable likelihood of injury.[4]

1. Hamilton v. Laclede Elec. Coop., Mo., 294 S.W.2d 11, 15(2); Lebow v. Missouri Public Service Co., Mo., 270 S.W.2d 713, 715; Howard v. St. Joseph Transmission Co., 316 Mo. 317, 332, 289 S.W. 597, 604(4), 49 A.L.R. 1034; Shannon v. Kansas City Light & Power Co., 315 Mo. 1136, 1150, 287 S.W. 1031, 1036; Schneiter v. City of Chillicothe, 232 Mo.App. 338, 344, 107 S.W.2d 112, 116(2).

2. Hull v. Gillioz, 344 Mo. 1227, 1236, 130 S.W.2d 623, 628(5); Emery v. Thompson, 347 Mo. 494, 498, 148 S.W.2d 479, 480 (3); Phillips v. Stockman, Mo.App., 351 S.W.2d 464, 472; LaPlant v. E. I. DuPont De Nemours & Co., Mo.App., 346 S.W.2d 231, 239; Taylor v. Hitt, Mo. App., 342 S.W.2d 489, 494(7); Street v. W. E. Callahan Const. Co., Mo.App., 147 S.W.2d 153, 155(3). See 2 Harper & James, Torts, § 16.9, loc. cit. 929;

2 Restatement of Torts, § 289, comment b, p. 763.

3. E. g., Erbes v. Union Elec. Co., Mo., 353 S.W.2d 659, 664–665; Lebow, supra, 270 S.W.2d loc. cit. 715–716; Laudwig v. Central Missouri Power & Light Co., 324 Mo. 676, 684–685, 24 S.W.2d 625, 627; Shannon, supra, 315 Mo. loc. cit. 1150, 287 S.W. loc. cit. 1036; Schneiter, supra note 1; Grady v. Louisiana Light, Power & Traction Co., Mo.App., 253 S.W. 202, 204 (1); Blackburn v. Southwest Missouri R. Co., 180 Mo.App. 548, 561, 167 S.W. 457, 460(6). See also Hale v. Montana-Dakota Utilities Co., 8 Cir., 192 F.2d 274, 276(4); Croxton v. Duke Power Co., 4 Cir., 181 F.2d 306, 308; 18 Am.Jur., Electricity, § 48, loc. cit. 446; Id., § 93, loc. cit. 487.

4. Schneiter, supra, 232 Mo.App. loc. cit. 345(2), 107 S.W.2d loc. cit. 116(2);

It is true that, as instant plaintiffs emphasize, a submissible case on the issue of foreseeability was made if the jury fairly could have found that, in the exercise of the highest degree of care, defendant reasonably could have anticipated that some injury was likely to have occurred to one lawfully near its transmission line, and it would not have been necessary for the jury to have been able to find that defendant could have anticipated the exact injury which did occur or the exact manner in which that injury happened.[5] And the reported cases dramatically demonstrate that the outer limits, within which jurors are permitted to find foreseeability, are (as logically they should be) exceedingly broad and flexible. But, we are mindful that our Supreme Court has pointed out that, in this category of actions [Hamilton v. Laclede Elec. Coop., Mo., 294 S.W.2d 11, 14] as well as in others where the same standard of care obtains [Brisboise v. Kansas City Public Service Co., Mo., 303 S.W.2d 619, 626], " 'even where the highest degree of care is demanded, still the one from whom it is due is bound to guard only against those occurrences which can reasonably be anticipated by the utmost foresight.' " See Hale v. Montana-Dakota Utilities Co., 8 Cir., 192 F.2d 274, 277; Atchison, T. & S. F. Ry. Co. v. Calhoun, 213 U.S. 1, 9, 29 S.Ct. 321, 323, 53 L.Ed. 671, 675. Or, as some of our brethren in other jurisdictions have put it, " * * * (T)he law does not require that a person, who maintains even so deadly an instrumentality as a high voltage electric wire, shall anticipate at his peril every possible fortuitous circumstance under which some person might make a contact with the wire, resulting in injury or death." Le Vonas v. Acme Paper Board Co., 184 Md. 16, 40 A. 2d 43, 45(10); Hamilton v. Southern Nevada Power Co., 70 Nev. 472, 273 P.2d 760, 763; Manaia v. Potomac Elec. Power Co., 4 Cir., 268 F.2d 793, 797.[6]

On the first point alone (i. e., on the submissibility of the case), defendant's-appellant's industrious counsel have listed thirty-one cases and equally-energetic counsel for plaintiffs-respondents has countered with thirty-seven. Being no less concerned than counsel about the right of the matter, we have read and considered all of the cited cases and many more; but neither counsel nor the court has uncovered any factually-analogous case *in this jurisdiction*. The nearest case on the facts (and it is still far distant) is Schneiter v. City of Chillicothe, 232 Mo.App. 338, 107 S.W.2d 112, in which plaintiff, a nine-year old boy shocked when he flew his kite into an uninsulated transmission line along a city street, had been cast in the trial court on a demurrer to his petition. Although it was decided upon appeal that the petition stated a cause of action, the opinion strongly suggests that instant plaintiffs did *not* make a submissible case. For, the salient and determinative facts pleaded in Schneiter, supra, were (1) that, *for a long period of time prior to plaintiff's injury*, children *habitually* had used an adjacent commons as a playground and had flown kites therefrom, and (2) that

---

Erbes, supra, 353 S.W.2d loc. cit. 664; Lebow, supra, 270 S.W.2d loc. cit. 715; Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233, 236(1); Williams v. Springfield Gas & Elec. Co., 274 Mo. 1, 8(1), 202 S.W. 1, 2; Grady, supra, 253 S.W. loc. cit. 204(1).

5. Erbes, supra, 353 S.W.2d loc. cit. 664; Lebow, supra, 270 S.W.2d loc. cit. 715; Thornton v. Union Elec. Light & Power Co., 230 Mo.App. 637, 644, 72 S.W.2d 161, 163; Kessler v. West Missouri Power Co., 221 Mo.App. 644, 650(3), 283 S.W. 705, 708(3).

6. See also Perrine v. Pacific Gas & Elec. Co., 186 Cal.App.2d 442, 9 Cal.Rptr. 45, 49(7); Sweatman v. Los Angeles Gas & Elec. Corp., 101 Cal.App. 318, 281 P. 677, 678; Rudd v. Public Service Co. of Okla., D.C.Okla., 126 F.Supp. 722, 724 (8), 725 (footnote 9); Hall v. Lorain-Medina Rural Elec. Co-op., 104 Ohio App. 278, 148 N.E.2d 232, 236(3); Richmond v. Florida Power & Light Co., Fla., 58 So.2d 687, 688(2); Dudding v. Florida Keys Elec. Co-op. Ass'n., Fla.App., 105 So.2d 597, 599; 18 Am.Jur., Electricity, § 53, p. 448.

defendant knew, or in the exercise of due care could and should have known, thereof; and, among the repeated references to those pleaded facts, we find this blunt statement in the opinion: "Whether or not the defendant was under any duty to the plaintiff depends on the facts alleged in the petition as to its knowledge of the plaintiff's habit of flying his kite from the street or the commons over which its wires passed." [232 Mo.App. loc. cit. 348, 107 S.W.2d loc. cit. 118] [7] In the case at bar, there was neither pleading nor proof of any habitual use or practice which could have charged defendant with knowledge that anyone was likely to come into contact, either direct or indirect, with its energized line 25½ feet above the ground.

The other Missouri cases cited by counsel or found by us, all involving energized wires which were uninsulated or inadequately insulated, fall into four broad factual classifications, towit, (1) those in which wires were maintained in places where defendant knew, or in the exercise of the highest degree of care could and should have known, that men would be likely to work in dangerous proximity thereto,[8] (2) those in which wires ran through trees,[9] (3) those in which wires were on the ground or so near thereto as to permit direct bodily contact,[10] and (4) those in which persons were engaged in moving houses along or across public highways.[11] None of the cited cases bears any factual resemblance to the case at bar; but, it is noteworthy and significant that, with the cases in the various classifications running the gamut of factual dissimilarity, all of them are strung like beads on the same legal thread of reasonable foreseeability.

Although no appellate court in Missouri heretofore has had occasion to consider whether a state of facts such as that before us lies inside the ambit of reasonable foreseeability within which our system of jurisprudence contemplates that jurors should resolve issues in tort cases, factually analogous situations have been presented in other jurisdictions where the overwhelming weight of authority is that such occurrences are not reasonably to be foreseen and thus that liability therefor should be denied as a matter of law.[12] As we shall observe briefly, the circumstances

7. In all of the kiteflying cases found in other jurisdictions, recovery has been *denied as a matter of law.* Watral's Adm'r. v. Appalachian Power Co., 273 Ky. 25, 115 S.W.2d 372; Pugh v. Tidewater Power Co., 237 N.C. 693, 75 S.E. 2d 766; Littleton v. Alabama Power Co., 243 Ala. 492, 10 So.2d 757; Kedziora v. Washington Water Power Co., 193 Wash. 51, 74 P.2d 898; Dilley v. Iowa Public Service Co., 210 Iowa 1332, 227 N.W. 173, 175; Richmond, supra note 6.

8. Erbes, supra note 3; Potter v. Sac-Osage Elec. Coop., Inc., Mo., 335 S.W.2d 192; Lebow, supra note 1; Thompson v. City of Lamar, 322 Mo. 514, 17 S.W.2d 960; Hickman v. Union Elec. Light & Power Co., Mo., 226 S.W. 570; Ryan v. St. Louis Transit Co., 190 Mo. 621, 89 S.W. 865, 2 L.R.A.(N.S.) 777; Geismann v. Missouri-Edison Elec. Co., 173 Mo. 654, 73 S.W. 654; Jamison v. Kansas City, 223 Mo.App. 684, 17 S.W.2d 621.

9. Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510; Shannon, supra note 1; Godfrey, supra note 4; Williams, supra note 4; Beckwith v. City of Malden, 212 Mo.App. 488, 253 S.W. 17.

10. Gellert v. Missouri Service Co., Mo., 221 S.W.2d 177; Pulsifer v. City of Albany, 226 Mo.App. 529, 47 S.W.2d 233; Grady, supra note 3; Faris v. Lawrence County Water, Light & Cold Storage Co., Mo.App., 198 S.W. 449.

11. Laudwig, supra note 3; Davis v. Missouri Elec. Power Co., Mo.App., 88 S.W. 2d 217, certiorari quashed State ex rel. Missouri Elec. Power Co. v. Allen, 340 Mo. 44, 100 S.W.2d 868; Blackburn, supra note 3.

12. Stanley v. Town of Smithfield, 211 N.C. 386, 190 S.E. 207; Callaway v. Central Georgia Power Co., 43 Ga.App. 820, 160 S.E. 703; Green v. West Penn Rys. Co., 246 Pa. 340, 92 A. 341, L.R.A.1915C, 151; Trout v. Philadelphia Elec. Co., 236 Pa. 506, 84 A. 967, 42 L.R.A.(N.S.) 713; Stark v. Muskegon Traction & Lighting Co., 141 Mich. 575, 104 N.W. 1100, 1 L.R.A.(N.S.) 822; Kelley v. Texas Utilities Co., Tex.Civ.App., 115 S.W.

in each of the three foreign cases cited by plaintiffs' counsel, in which a contrary conclusion was reached, afforded stronger support for submissibility than do the facts of the instant case. In City of Marlow v. Parker, 177 Okl. 537, 60 P.2d 1044, an eleven-year old boy swung a wire into an uninsulated line crossing the back yard of his home at a height of only 8 to 10 feet— a compelling and distinguishing state of facts as was pointed out in Rudd v. Public Service Co. of Okla., D.C.Okla., 126 F.Supp. 722, 724 (footnote 5). In Krastel v. Long Island Lighting Co., 272 App.Div. 833, 70 N.Y.S.2d 617, an eight-year old boy threw a wire over an uninsulated line 16½ feet above the ground. Contrast Rand v. Long Island R. Co., 197 Misc. 744, 95 N.Y.S.2d 688, 691–692(2), where the court said that the accident befalling a fifteen-year old high school student, when he threw a wire over an uninsulated line some 5 to 10 feet above his head, " 'was not within the range of reasonable anticipation on the part of the defendant.' " In Martens v. Public Service Co. of Northern Illinois, 219 Ill.App. 160, where a seven-year old boy threw a wire over an inadequately-insulated line in a public street in the City of Waukegan, (1) defendant's violation of a city ordinance requiring "a durable insulation of not less than two coatings" was "of itself prima facie evidence of negligence" and (2) "(t)he evidence (showed) that the children of the neighborhood * * * had been in the habit for a long time * * * as a part of their play, to throw strings over the wires in question."

On the other hand, we note specifically that, in Howard v. St. Joseph Transmission Co., 316 Mo. 317, 331, 289 S.W. 597, 603–604, 49 A.L.R. 1034, our Supreme

Court approvingly cited and quoted from Trout v. Philadelphia Elec. Co., 236 Pa. 506, 84 A. 967, 42 L.R.A.(N.S.), 713 (one of the cases listed marginally in note 12), in which the Supreme Court of Pennsylvania denied recovery as a matter of law for the death of a thirteen-year old boy who had been electrocuted when, having gone through a trap door onto the roof of a house, he had thrown a corncob tied to a string over an inadequately-insulated line about 4½ feet from the edge of the roof and had pulled the line within reach to detach a kite.

We quickly agree with counsel for instant plaintiffs that defendant reasonably might have been charged with knowledge that children of its rural customers would play in their front yards, but it does not follow that defendant reasonably should have anticipated that some such child would be likely to come into contact, either direct or indirect, with the energized line 25½ feet above the ground. With respect to such lines, we believe the common-sense pronouncement of our Supreme Court to be particularly pertinent: " * * * *certainly the exercise of the highest degree of care requires that such wires be so isolated that they will not be likely to cause injury to persons in places where they may lawfully be and may be reasonably expected. Of course, one way this may be done is to place them at a height where persons are not likely to come in contact with them * * * *"* (All emphasis herein is ours.) Gladden, supra, 277 S. W.2d loc. cit. 515. As hypothesized in plaintiff's principal verdict-directing instruction in Erbes v. Union Elec. Co., Mo., 353 S.W.2d 659, one of the alternative protective measures which defendant could have adopted to have "adequately and suf-

---

2d 1233, error dismissed; Ball v. Gulf States Utilities Co., Tex.Civ.App., 123 S.W.2d 937, error dismissed; Fredericks' Adm'r. v. Kentucky Utilities Co., 276 Ky. 13, 122 S.W.2d 1000; Kempf v. Spokane & I. E. R. Co., 82 Wash. 263, 144 P. 77, L.R.A.1915C 405; Musser v. Norfolk & W. Ry. Co., 122 W.Va. 365, 9 S.E.2d

524; Rand v. Long Island R. Co., 197 Misc. 744, 95 N.Y.S.2d 688. Consult also Alabama Power Co. v. Cooper, 229 Ala. 318, 156 So. 854; Davis v. Carolina Power & Light Co., 238 N.C. 106, 76 S.E.2d 378; Hassett v. Palmer, 126 Conn. 468, 12 A.2d 646, 650(6).

ficiently guarded" its high-voltage lines was to have *"isolated said power lines by elevating them an adequate and safe height in the air"* [353 S.W.2d loc. cit. 663]; and, as the court commented, *"in that event workmen on this construction project would have been reasonably protected from the danger of contact with said wires."* [353 S.W.2d loc. cit. 664] In Empire District Elec. Co. v. Harris, 8 Cir., 82 F.2d 48, where a fourteen-year old boy had been injured while climbing on a transformer station, plaintiff's counsel insisted that a fence, preventive guard, or warning sign would have been necessary to have absolved defendant from negligence. Rejecting that contention and stating that defendant was not confined to that means of avoiding danger which plaintiff's counsel might have selected, the court sagely observed that: *"It* (defendant) *might as effectively use others, among which placing the danger out of probable reach is quite usual. That is why charged wires are placed on high poles. The same thought and action govern every parent in placing dangerous things where they reasonably think their children cannot get them."* [82 F.2d loc. cit. 53]

■ Obviously, what may be "an adequate and safe height in the air" [353 S.W.2d loc. cit. 663], which would place any subsequent indirect contact with the line beyond the pale of reasonable foreseeability, must depend in each instance upon the circumstances of that case. E. g., one important consideration, among the many relevant ones, is whether the high-voltage lines involved in the accident under review " 'are suspended over the streets of populous cities or towns, for here the danger is great, and the care exercised must be commensurate with it.' " Erbes, supra, 353 S.W.2d loc. cit. 665; 18 Am.Jur., Elec-tricity, § 48, loc. cit. 446. See also Hickman v. Union Elec. Light & Power Co., Mo., 226 S.W. 570, 573. But, in the instant case, we entertain no doubt but that defendant's transmission line was elevated to such height that defendant reasonably could not have anticipated any contact, either direct or indirect, by a youth playing in an adjacent yard, and that, to stretch the elastic band of reasonable foreseeability around the undisputed and conceded facts of this situation, would require us to take a seven-league stride beyond the perimeter permissible under any prior holding in this state—a stride which we believe would be improper and forbidden unless and until our courts were to forthrightly renounce and frankly repudiate the doctrine to which they have held consistently, albeit sometimes tenuously, that those engaged in generating, transmitting or distributing electric energy are not absolute insurers of the public safety.

Thus concluding, as a matter of law, that defendant was not guilty of actionable negligence, it becomes unnecessary for us to rule other points presented, including the contention that, in any event, George was guilty of contributory negligence as a matter of law. Those interested in this subject may consult State ex rel. Kansas City Light & Power Co. v. Trimble, 315 Mo. 32, 39–41, 285 S.W. 455, 457–458, 49 A.L.R. 1047; Jones v. Kentucky Utilities Co., Ky., 334 S.W.2d 263; Hamilton v. Southern Nevada Power Co., 70 Nev. 472, 273 P.2d 760; Austin v. Public Service Co. of Northern Illinois, 299 Ill. 112, 132 N.E. 458, 462, 17 A.L.R. 795.

The judgment for plaintiffs is reversed.

RUARK, P. J., and McDOWELL, J., concur.