

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| RONALD and PATRICIA BASTA, as heirs at law to JOSEPH BASTA, | ) ) ) | |
| Respondents, | ) ) | |
| v. | ) ) ) | WD77251 |
| | ) ) | OPINION FILED: December 16, 2014 |
| KANSAS CITY POWER & LIGHT COMPANY, | ) ) ) ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Buchanan County, Missouri**
**The Honorable Weldon C. Judah, Judge**

**Before Division II:** Joseph M. Ellis, Presiding Judge, and
Mark D. Pfeiffer and Gary D. Witt, Judges

Kansas City Power & Light Company ("KCP&L") appeals the Judgment of the Circuit Court of Buchanan County, Missouri ("trial court"), entered on a jury verdict in favor of Ronald and Patricia Basta ("the Bastas") in their action for the wrongful death of their 31-year-old son, Joseph Basta ("Joey"),[1] resulting from electrocution. We affirm.

---

[1] We refer to the decedent in the same fashion as the parties referred to him at the trial below. No familiarity or disrespect is intended.

## Factual and Procedural Background[2]

Larry and Judy Blankenship hired Mike Rose Roofing to reroof their flat-roofed one-story home that was constructed in 1961. Joey was an experienced roofer; he had worked for Rose on and off for six or seven years and was one of the roofers on the crew for the Blankenship job. On June 17, 2009, Joey was tragically electrocuted while working near a service drop line, which brought electricity into the home through the point at which the service line attached to equipment—called split-bolt connectors—above the roof of the house.

More specifically, Joey and another roofer, Billy Hendrix, were installing a metal and rubber boot around the riser pipe (also called meter mast or service mast), a two-inch galvanized pipe that extends from the meter can through the roof. The riser pipe was topped with a copper weatherhead, a device to keep rainwater from going down the pipe and into the electrical equipment. At some point during this activity, Joey came into contact with both an uninsulated connector and the weatherhead. The weatherhead served as a direct ground permitting the electric current from the connector to pass through Joey's body, causing ventricular fibrillation and, ultimately, cardiac arrest.

The Bastas ultimately went to trial against one defendant, KCP&L, the supplier of electrical service to the Blankenships' home. The verdict-directing instruction given to the jury stated:

> In your verdict you must assess a percentage of fault to defendant whether or not decedent Joey Basta was partly at fault if you believe:
>
> First, plaintiffs are the parents of decedent Joey Basta, and
>
> Second, either
> defendant failed to insulate the connectors, or
> defendant failed to inspect the connectors, or

---

[2] "On appeal from a jury trial, we review the facts in the light most favorable to the jury's verdict." *Norfolk S. Ry. Co. v. Crown Power & Equip., L.L.C.*, 385 S.W.3d 445, 449 n.2 (Mo. App. W.D. 2012).

defendant failed to maintain the service drop lines 18 inches above the roof, and

Third defendant in any one or more of the respects submitted in paragraph second was thereby negligent, and

Fourth such negligence directly caused or directly contributed to cause the death of Joe[y] Basta.

The term "negligent" or "negligence" as used in this instruction means the failure to use the highest degree of care. The phrase "highest degree of care" means that degree of care that a very careful person would use under the same or similar circumstances.

After a five-day trial, the jury found the total amount of the Bastas' damages to be $2 million. The jury assessed KCP&L as 50% at fault and Joey as 50% at fault. The trial court entered judgment in favor of the Bastas and against KCP&L in the amount of $1 million.

KCP&L filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, which the trial court denied. KCP&L timely appealed, asserting three points of error.

**Point I**

**Standard of Review**

Initially, we note that the denial of a motion for new trial is not an appealable order. "No appeal lies from an order overruling a motion for a new trial, but the aggrieved party may appeal from a final judgment entered against him." *Walker v. Thompson*, 338 S.W.2d 114, 116 (Mo. 1960); *Burbridge v. Union Pac. R.R. Co.*, 413 S.W.3d 649, 654 (Mo. App. E.D. 2013). In its first point relied on, KCP&L asserts that "[t]he trial court prejudicially erred in denying KCP&L's motion for new trial because the jury entered a general verdict and at least one of the three disjunctive submissions in the verdict-directing instruction was not supported by substantial evidence." We therefore assume that KCP&L's appeal was from the judgment

3

entered by the trial court on the jury's verdict and review the same for "substantial evidence" supporting it.

## Analysis

KCP&L asserts that the trial court erred in denying KCP&L's motion for new trial because the jury entered a general verdict on a three-part disjunctive submission and because at least one of the three disjunctive submissions was not supported by substantial evidence. Specifically, KCP&L contends that there was no substantial evidence in the record either: (i) that KCP&L had any duty to maintain the height of the service drop line at eighteen inches above the roof; or (ii) that the height of the service drop line more probably than not actually or proximately caused or contributed to cause Joey's accident.

The Bastas' expert, professional consulting engineer Donald Johnson, testified about his lengthy experience in the industry and opined that KCP&L had a duty to maintain the overhead service drop power line eighteen inches above the roof, a *minimum* requirement of the National Electric Safety Code ("NESC"). Johnson testified that the NESC contains the *minimum* standards, including safety standards, for electric utilities across the nation. He opined that there should be a minimum of eighteen inches clearance from the roof to the lowest conductor and that KCP&L breached the standard of care by failing to provide such clearance.

During the course of Johnson's testimony, counsel for KCP&L successfully lodged numerous objections to Johnson's testimony. And, counsel for KCP&L ably cross-examined Johnson, eliciting numerous instances of testimony favorable to KCP&L's defense. In one instance, counsel for KCP&L elicited testimony from Johnson that Johnson did not know which version of the NESC was in effect at the time of the alleged negligent installation and/or repair of the service drop line by KCP&L. But no testimony was ever elicited from Johnson or any other

4

witness that the version in effect in 1994 (the time frame in which the reasonable inferences from the evidence suggest that the service drop line was repaired and/or replaced) was any different in its service drop line height requirements than the version that existed at the time of trial. And Johnson never retracted his opinion that KCP&L had breached the standard of care as to the eighteen-inch clearance; nor did Johnson ever retract his opinion that the NESC supported his opinion. To be sure, KCP&L presented evidence through its expert about the *1961* version of the NESC (the year the home had been constructed); yet, though it presumably possessed the capability to review every version of the NESC from 1961 forward, KCP&L never objected *at trial* to the foundation of Johnson's expert opinion, nor did it move to strike Johnson's testimony, which was based in large part on the minimum requirements of the NESC.

Though KCP&L's expert claimed the 1961 version of the NESC did not support Johnson's testimony, numerous witnesses testified that the service drop line wiring had been replaced in the years subsequent to the home's construction. Kim Jennings, a master electrician, inspected the wiring and testified that the service drop was not done in the 1960s because the insulation covering the triplex wire in the 1960s was gray; however, he noticed that the insulation covering the triplex wire at the Blankenships' home was bright black. Based upon this evidence and Jennings's knowledge of a severe 1994 ice storm in the area (bolstered by Mr. Blankenship's testimony that, in fact, a severe ice storm in the past had caused a power outage), Jennings opined that the newer shiny black service drop wiring feeding the house "was installed in 1994 when we had a horrible storm in this area that took down virtually 50 percent of the overhead drops in the entire area."[3] Likewise, Johnson opined that the shiny black service drop wire coming from the transformer pole was "a lot newer" than the dull, gray, cracked wires

---

[3] At trial, KCP&L had objected to Jennings's testimony as speculative. The trial court overruled the objection and KCP&L has not challenged the trial court's ruling on appeal.

5

going into the house.  Similarly, Albert Cowan, a licensed professional engineer, testified that the service drop wires were not original, had a shiny surface, and "looked fairly new," while the service wire going into the residence was discolored and showed surface cracking.

Evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached, but they do not establish a legal standard of care.  *Pierce v. Platte-Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 772 (Mo. banc 1989); *Eagleburger v. Emerson Elec. Co.*, 794 S.W.2d 210, 231 (Mo. App. S.D. 1990).  While the NESC does not establish the determinative standard of care, it is relevant evidence for the jury to consider in weighing the issue of breach of due care.  *Pierce*, 769 S.W.2d at 773.  Thus, here, irrespective of what version of the NESC was in effect at the relevant time of KCP&L's installation, repair, or replacement of the service drop line, the evidence relating to NESC safety standards relates to the *admissibility* of Johnson's testimony in this case, not the *submissibility* of the case to the jury.

KCP&L asserted, for the first time in its post-trial motion and later, on appeal, that Johnson's opinion lacked foundation.  If an expert's proffered opinion testimony is challenged based on whether it is supported by a sufficient factual or scientific foundation, the question is one of *admissibility*, and it must be raised by a timely objection or motion to strike.  *Sanders v. Ahmed*, 364 S.W.3d 195, 209 (Mo. banc 2012); *Washington ex rel. Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995).  Here, KCP&L did not challenge the foundation of or otherwise object to Johnson's testimony regarding KCP&L's duty to maintain an eighteen-inch clearance.  "Once opinion testimony has been admitted, as any other evidence, it may be relied upon for purposes of determining the submissibility of the case."  *Sanders*, 364 S.W.3d at 209 (internal quotation omitted).  The natural probative effect of the opinion testimony was for the jury's consideration.  *Id.*  KCP&L's post-trial argument that Johnson's opinion lacked an

6

evidentiary foundation "comes too late to give opposing counsel an opportunity to correct any deficiencies in the questions or lay an appropriate foundation for the witness's opinion." *Id.* (internal quotations omitted). By failing to timely object or to make a motion to strike, KCP&L waived any issue it might have had to the admissibility of Johnson's opinion testimony. *See id.*

KCP&L also argues that the Bastas presented no substantial evidence to support their disjunctive submission that KCP&L's failure to maintain the service drop line at eighteen inches above the roof caused or contributed to cause Joey's accident. "To make a submissible case in a wrongful death suit, [the Bastas] must show that the negligence of [KCP&L] 'directly caused' or 'directly contributed to cause' [Joey's] death." *Id.* at 208. "Missouri requires a showing of two types of causation: 'but-for' causation and 'proximate' causation." *Id.*

In this wrongful death action, the Bastas must establish that 'but for' KCP&L's actions or inactions, Joey would not have died. *Id.* at 209. "But-for causation is also known as 'causation in fact.'" *Id.* "Causation in fact is an issue for the jury if sufficient evidence is presented from which the jury could reasonably find that the plaintiff's injury was a direct result of the defendant's negligence." *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 599 (Mo. App. W.D. 2013) (internal quotation omitted). "In establishing whether a submissible case has been made on the basis of causation, . . . [a]bsolute certainty is not required to prove a causal connection between the defendant's actions and plaintiff's injury." *Id.* (internal quotation omitted). "It is wholly permissible for the jury to infer causation from [the] circumstances." *Id.* (internal quotation omitted). "If the logical conclusion from the evidence is that if certain things had been done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." *Id.* (internal quotation omitted).

7

"The test for establishing proximate cause is whether the negligence is an efficient cause which sets in motion the chain of circumstances leading to the plaintiff's injuries or damages." *Id.* (internal quotation omitted). "A submissible case is made on th[e] issue [of proximate cause] if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence." *Id.* (internal quotation omitted).

The emergency room doctor opined that the cause of Joey's death was electrocution: electrical shock caused Joey's heart to go into ventricular fibrillation. Here, the Bastas presented witnesses who testified that the source of electrical shock was the uninsulated split-bolt connectors.

Jeff Wolf, KCP&L's corporate representative at trial, testified regarding the Blankenships' electric service. KCP&L owns, maintains, and controls the utility pole in the Blankenships' backyard. At the top of that pole is a transformer that converts the 7200 volts of electricity in the distribution wires into 120 volts. The service drop consists of three wires running from the transformer to the Blankenships' house. Two black wires each carry 120 volts from the transformer and go through a split-bolt connector and into a gray house wire. A third silver supporting wire is the neutral or "messenger" wire. This wire does not have any power from the transformer. It is not insulated and is tied directly to the ground. Wolf testified that the only "hot" parts of the service are the connectors:

Q:    So if you were—so then as far as uninsulated live or hot parts, the only two uninsultated live or hot parts in this entire picture are this connector and this connector (indicating), those being the ones attached between the black and the gray lines; correct?

A:    Yes.

Johnson, the Bastas' expert, testified that the eighteen-inch clearance requirement in the NESC is a safety requirement. He opined that it was foreseeable that people would be up on

8

their roofs in the vicinity of the wires and connectors. He stated that, in this case, it would have made it easier for the roofers to work because an eighteen-inch clearance would have been high enough "where you wouldn't have to monkey around underneath it." If there had been an eighteen-inch clearance:

Q:   . . . the wires—the energized conductors wouldn't be as close to the boot of the pipe?

A:   That's right.

Q:   There would be more room to work?

A:   Exactly.

Q:   Wouldn't have been as close to Joey's bare leg, from what you know?

A:   That's right.

Johnson also testified that the only two places on the roof that could have delivered an electric shock to Joey would be the two uninsulated connectors:

Q:   So if a person were to come into contact with the gray insulation or the black insulation, would they—what would happen to them?

A:   Nothing. They wouldn't feel anything. Just like your extension cord in your house, you know, you can touch that and it doesn't hurt because it's insulated.

Q:   All right. But what happens if you touch one of the connectors?

A:   Then you get zapped, especially—you're going to get zapped, anyway, but it's really going to be significant if you're grounded somewhere. If you're touching the mast or that messenger cable, then it will be significant.

Johnson concluded that Joey came into contact with one of the connectors.

Cowan testified that the service point of connection between the utility's overhead service wires and the house service entrance wires was made with uninsulated split-bolt connectors. According to Cowan, "anyone who came into contact with those connectors, they

9

would be energized; and if they completed a circuit to ground or another energized conductor, would receive an electrical shock of some type."

From the foregoing evidence, the jury could have logically concluded that if there had been an eighteen-inch clearance, the energized conductors would not have been as close to the boot of the pipe where Joey was working and would not have been as close to Joey's bare leg. Viewing the evidence in the light most favorable to the verdict, there is substantial circumstantial evidence of both a "but for" and "proximate" causal connection between the service drop line negligence argument and Joey's death. Thus, the challenged theory of liability submitted to the jury was supported by substantial evidence to make a submissible case.

Point I is denied.

## Point II

### Standard of Review

The trial court's decision to admit evidence is reviewed for an abuse of discretion. *Rouse v. Cuvelier*, 363 S.W.3d 406, 415 (Mo. App. W.D. 2012). "[W]e presume the trial court's finding is correct, and reverse only when the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration . . . ." *Id.* (internal quotation omitted). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.* (internal quotation omitted). "When reviewing matters involving admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial as to deprive the defendant of a fair trial." *Alberswerth v. Alberswerth*, 184 S.W.3d 81, 100 (Mo. App. W.D. 2006) (internal quotation

omitted). "An error in the admission of evidence is prejudicial if it affects the result or outcome of the trial." *Id.*

## Analysis

KCP&L asserts that the trial court erred in overruling KCP&L's objection to the Bastas reading part of the deposition testimony of two experts at trial and in denying KCP&L's motion for new trial on that basis. Specifically, KCP&L argues that it was unfairly surprised and denied a fair trial because the Bastas had failed to identify the two experts in interrogatory answers or otherwise timely disclosed that they would be testifying on behalf of the Bastas, as required by the trial court's pretrial scheduling order.

The Bastas originally filed a wrongful death action against KCP&L *and* the Blankenships following Joey's death. The Blankenships identified and produced two experts for deposition: electrical engineer Cowan and electrician Jennings. Both were deposed by the parties, including KCP&L. Thereafter, the Bastas voluntarily dismissed their suit, without prejudice. Subsequently, the Bastas re-filed their wrongful death action in the same circuit court, against the same parties. The parties agreed to and did use the discovery completed in the dismissed case as though taken in the subject case. Pursuant to the agreement of the parties, in the scheduling order in the re-filed case, the trial court ordered that "[n]o new pretrial discovery shall be allowed."

KCP&L submits that even though it had previously questioned Cowan and Jennings in deposition, those depositions occurred when the experts were testifying as witnesses for KCP&L's former "friendly" co-defendants, the Blankenships. KCP&L contends that its approach in those depositions would have been different had the witnesses been disclosed as experts on behalf of the Bastas.

11

KCP&L filed its designation of deposition excerpts to be read at trial, which included portions of Cowan's deposition testimony and Jennings's deposition testimony that would be subject to withdrawal if the trial court sustained KCP&L's motion *in limine* to exclude such testimony. Subsequently, the Bastas filed their deposition designations, which included portions of Cowan's deposition testimony and Jennings's deposition testimony. Though the deposition designations occurred seven weeks before trial, KCP&L never sought leave of court to re-depose either of these witnesses, nor did KCP&L request a trial continuance. At trial, KCP&L objected to Jennings's deposition testimony:

> As we said earlier, we're going to object on several grounds. No. 1, this expert was not identified by plaintiffs in discovery. No. 2, it's cumulative to the other experts. No. 3, these—Mr. Jennings was an expert for the Blankenships, and now this testimony from this expert witness is going to be read to the jury, and the jury's going to have no idea who this guy is.

The trial court resolved the objection by identifying Jennings as an acquaintance of the Blankenships who was asked to inspect their premises following the accident. Before the deposition of Cowan was read to the jury, the parties consented to the trial court introducing Cowan as an acquaintance of the Blankenships who was asked to inspect their premises following the accident. Thereafter, KCP&L renewed its objection as to Cowan's deposition testimony, which the trial court overruled.

> Rule 57.07 provides:
>
> (a) Use of Depositions. Any part of a deposition that is admissible under the rules of evidence applied as though the deponent were testifying in court may be used against any party who was present or represented at the taking of the deposition or who had proper notice thereof. Depositions may be used in court for any purpose.

It is the general rule that a deposition taken in a prior case is inadmissible because the parties not involved in the prior deposition had no real opportunity to cross-examine the witness. *Maturo v. Stone*, 856 S.W.2d 84, 85 (Mo. App. E.D. 1993). However, "[a]n exception to the general rule

12

of inadmissibility exists when there is a clear identity of issues and of parties." *Id.* "The issues in the two proceedings must be the same." *Id.* "The parties need not be identical, but must be in privity with one another." *Id.* "The courts have interpreted parties as being in privity with one another when they have an 'identity of interest', or the same interest and motive." *Id.* "Prior deposition testimony is admissible when the prior proceeding involved the same parties, or those with an 'identity of interest' as the parties in the subsequent case, and the same issues are litigated, because the parties against whom the deposition is being used are said to have had sufficient opportunity to cross-examine the witness when the testimony was first given." *Id.* at 85-86. "When there is an identity of issues and of parties, the interests of the parties in the subsequent case are fully protected." *Id.* at 86.

This is consistent with the longstanding principle on this topic announced by our Missouri Supreme Court in *Bartlett v. Kansas City Public Service Co.*, 160 S.W.2d 740, 742-43 (Mo. 1942):

> Where a witness has testified to certain facts in a former proceeding, either in open court or by deposition, and a stenographic record of his testimony is offered in a later proceeding in which the same issue of fact is involved, the reception of this evidence is not open to objection on the ground that the witness has made the statement without being sworn for he was under oath when he testified. The sole possible objection is that the witness is not subject to cross-examination. Where the former proceeding is between the same parties involved in the subsequent case and the same issues are litigated, this objection too is not tenable. For the party opponent has had sufficient opportunity to cross-examine at the time the testimony was first given. Thus it is generally, though conditionally, recognized that under such circumstances, if at the time of the second trial the witness is unavailable, his testimony may be read in evidence.

*See also Maxwell v. City of Springfield*, 705 S.W.2d 90, 93 (Mo. App. S.D. 1986).

Here, both Jennings and Cowan were designated as expert witnesses by the Blankenships and deposed by the parties, including KCP&L, during pretrial discovery in the Bastas' original wrongful death suit against the Blankenships and KCP&L. The parties stipulated that discovery

13

from the dismissed case would be used in the present case as though taken in the present case. There is identity of issues and parties in the two cases. Further, KCP&L never sought relief for their claimed prejudice; KCP&L never sought leave of court to re-depose the witnesses nor to request a trial continuance. Under these circumstances, the trial court did not abuse its discretion in admitting the deposition testimony.

Point II is denied.

## Point III

### Standard of Review

"The appropriate standard of care is a question of law." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 158 (Mo. banc 2000). Similarly, whether a jury is properly instructed is a matter of law subject to *de novo* review. *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010). "Review is conducted in the light most favorable to the submission of the instruction, and if the instruction is supportable by any theory, then its submission is proper." *Id.* To reverse a jury verdict on the ground of instructional error, the party challenging the instruction must show that the error resulted in prejudice that materially affects the merits of the action. *Id.*

### Analysis

KCP&L asserts that the trial court erred in submitting the Bastas' verdict-directing instruction to the jury because the instruction improperly defined "negligent" or "negligence" as failure to use the highest degree of care. KCP&L argues that Missouri law[4] and public policy

---

[4] KCP&L cites to *Foote v. Scott-New Madrid-Mississippi Electric Cooperative*, 359 S.W.2d 40 (Mo. App. 1962). In *Foote*, the electrocution and death incident involved high-voltage electric lines and the court held that, "those generating, transmitting or distributing [electricity] should be obligated by law, as they are, to exercise care commensurate with the nature and effect of that force and the danger and hazard incident thereto" and ultimately concluded that the degree of care to be applied was the highest degree of care. *Id.* at 43. The *Foote* court did not conclude, conversely, that *low-voltage* electrocution death cases should be instructed on an ordinary care standard; yet, KCP&L extrapolates that this is what the *Foote* court intended by its "commensurate with the danger"

14

require that where injury is caused by low voltage rather than by high voltage, a utility should be held to an ordinary care standard.

KCP&L argues that a lower standard of care should be applied to electric utilities where low-voltage household current is the agent of injury. KCP&L urges that only an "ordinary" standard of care instruction was appropriate, commensurate with the *lesser risks* imposed by low-voltage lines, relying upon cases from other states in support of its argument.[5] The flaw in KCP&L's reliance upon this precedent is that none of those cases involves undisputed evidence

statement. We disagree and find it no coincidence that the long line of Missouri precedent on this topic detailed in our ruling today repeatedly holds suppliers of electricity to the highest degree of care.

[5] KCP&L cites precedent from 37 states outside of Missouri. We have read each of those cases and find that **none** of these cases suggests that an ordinary care instruction would be appropriate in the factual and evidentiary circumstances of the present case. In fact, of the multitude of cases string cited to this court, only five of the cases related to injury caused by low-voltage electricity and in only one of those cases did an expert opine as to the risk of **insulated** wires carrying low-voltage electricity. For example, in *Wyrulec Co. v. Schutt*, 866 P.2d 756, 762 (Wyo. 1993), the court noted that a highest degree of care standard was not appropriate where no evidence was presented as to the danger of the low-voltage lines in question, stating, "[I]t is counsel's function to present the jury with argument that [low-voltage] electricity's inherently dangerous nature requires the highest degree of care." Similarly, in *Brashear v. Puget Sound Power & Light Co.*, 667 P.2d 78, 81-82 (Wash. banc 1983), the court noted that high-voltage electricity cases required a highest degree of care standard given the deadly propensities of high-voltage electricity, but *absent evidence* of the inherently deadly characteristics of low-voltage electricity, it would not extend highest degree of care to such low-voltage cases. Again, in *Eastern Shore Public Service Co. v. Corbett*, 177 A.2d 701, 708-09 (Md. 1962), the court refused to apply highest degree of care to a low-voltage electrical injury case, but couched its rationale by noting, "there is *no testimony* that [low-voltage electrical shocks] are, of themselves, inherently deadly or likely to result in serious bodily harm." (Emphasis added.) Conversely, the expert testimony in *Van Leet v. Kilmer*, 169 N.E. 644 (N.Y. 1930), was that <u>insulated</u> low-voltage wires were not deadly, justifying an ordinary care standard. As we note in our ruling, these cases simply are inapposite to the present case, as there was much testimony that the <u>uninsulated</u> low-voltage wires in question were inherently *deadly*. Frankly, the vast majority of the cases from other jurisdictions cited by KCP&L were cases that analyzed high-voltage electricity as a "deadly" dangerous form of electricity, *justifying the use of the highest degree of care standard*. For example, in *Scott v. Claiborne Electric Cooperative, Inc.*, 13 So.2d 524, 528-29 (La. Ct. App. 1943), the court noted that where the wires maintained by the supplier of electricity were of such nature "so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence." *See also Cerretti v. Flint Hills Rural Elec. Co-op. Ass'n*, 837 P.2d 330, 339 (Kan. 1992); *German v. Ill. Power Co.*, 451 N.E.2d 903, 909 (Ill. App. Ct. 1983); *Gilbert v. Duluth Gen. Elec. Co.*, 100 N.W. 653 (Minn. 1904). And, in a case from Mississippi, the court noted that "highest degree of care" and "ordinary care for a distributor of electricity" may be one in the same:

> The degree of diligence which a distributor of electricity must observe in the distribution of the dangerous agency of electricity is a very high degree of care. . . . To declare that the utmost care must be used to prevent injury sound[s] different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is, in its practical application and in view of the highly dangerous character of electricity, a relatively high degree of care.

*Miss. Power & Light Co. v. Shepard*, 285 So.2d 725, 729 (Miss. 1973) (internal quotation omitted).

15

that *low*-voltage lines (and the electrocution potential associated therewith) are often *more dangerous* than *high*-voltage lines. In fact, the cases from other jurisdictions relied upon by KCP&L clearly suggest that where there is testimony that the electricity in question, low or high voltage, is "inherently dangerous" or "inherently deadly or likely to result in serious bodily harm," such evidence would justify a "highest degree of care" jury instruction. That is precisely the evidence of the present case. Here, the undisputed evidence at trial was that low-voltage currents are as dangerous and, often, *more dangerous* than high-voltage currents and are certainly inherently deadly. KCP&L's expert Brooks testified that:

> [A]ctually, low currents have more of a propensity to kill you than high currents do. High currents will burn you. Different—low currents put your heart in fibrillation, and that's not self-correcting, unless you de-fib and do CPR pretty quickly. High currents will stop your heart, which sounds worse; but when you get off of it, if it starts, it's going to start in rhythm and keep pumping blood. So low currents to an extent—I mean, even stuff in your house, unfortunately, you have the propensity if you go into fibrillation that, again, that's—that will kill you.

The Bastas' expert Johnson also testified regarding the danger of low voltage:

> Q: . . . And which is more—which is more dangerous or—if one is more dangerous than the other, high voltage or low voltage?
>
> A They're both dangerous.
>
> Q: All right. And is high voltage more dangerous than low voltage?
>
> A: No, not necessarily.
>
> Q: Wh[y] is low voltage so dangerous?
>
> A: People have the misperception that it's not dangerous. And that's the thing I've ran into in my career, is they think that even the socket is, you know, quite safe; but it's really not. You know, there's more—in my experience, there's—and research, there's more people electrocuted by low voltage, especially the house circuit, than by high voltage.

16

More importantly, with regard to suppliers of electricity, the law is well-settled in Missouri on this topic. "Missouri courts have repeatedly held that a supplier of electricity is . . . required to exercise the highest degree of care to prevent injury." *Balke v. Cent. Mo. Elec. Coop.*, 966 S.W.2d 15, 25 (Mo. App. W.D. 1997).[6] "A [s]upplier of electricity must exercise the highest degree of care to keep [its] wires in such condition as to prevent injury to others who lawfully may be in close proximity to those wires." *Grattan v. Union Elec. Co.*, 151 S.W.3d 59, 63 (Mo. banc 2004) (internal quotation omitted).

> Missouri decisions recognize that while a generator and transmitter of electricity is not an insurer of the safety of all persons, it is nonetheless required to use the highest degree of care to prevent injury which it could anticipate, even though it did not anticipate the exact injury which occurred or the exact manner in which said injury occurred.

*Mrad v. Mo. Edison Co.*, 649 S.W.2d 936, 940 (Mo. App. E.D. 1983). *See also Graves v. Atchison-Holt Elec. Co-op.*, 886 S.W.2d 1, 7 n.3 (Mo. App. W.D. 1994) ("As to the supplier of electricity, the supplier is required to exercise the highest degree of care to prevent injury it can reasonably anticipate."); *Merrick v. Sw. Elec. Co-op.*, 815 S.W.2d 118, 120 (Mo. App. S.D. 1991) ("[W]hile a supplier of electricity is not an insurer of everyone's safety, the supplier is required to exercise the highest degree of care to prevent injury it can reasonably anticipate."). And, very recently, our Missouri Supreme Court has reiterated its justification for applying the highest degree of care to electric utilities, noting that "[e]lectricity is one of the most dangerous agencies ever discovered by human science[.]" *Chavez v. Cedar Fair, LP*, No. SC 93658, 2014

---

[6] Of note, in *Balke*, one issue in the case was whether the doctrine of strict liability should be imposed upon suppliers of electricity. *Balke v. Cent. Mo. Elec. Coop.*, 966 S.W.2d 15, 22-25 (Mo. App. W.D. 1997). In rejecting this argument, we noted that suppliers of electricity were already subject to the highest degree of care standard and stated: "The electricity which is generated and released at the power plant is considerably higher in voltage than that which is expected to reach the consumer, and as a result, undergoes a substantial change in form before entering the consumer's home." *Id.* at 25. Thus, the rationale for not extending strict liability to suppliers of electricity was, in part, because even the supply of the lowest voltage of electricity by an electrical company subjects that supplier of electricity to the highest degree of care . . . a rationale that KCP&L ignores in its appellate briefing.

WL 5856696, at *7 (Mo. banc Nov. 12, 2014) (internal quotation omitted). In fact, the full

context of the quotation relied upon by the *Chavez* court is instructive to this case:

> Electricity is one of the most dangerous agencies ever discovered by human
> science, and, owing to that fact, it was the duty of the electric light company to
> use every protection which was accessible to insulate its wires *at all points where
> people have the right to go*, and to use the utmost care to keep them so.

*Geismann v. Mo. Edison Elec. Co.*, 73 S.W. 654, 659 (Mo. 1903) (emphasis added).

The same is true here. The verdict-directing instruction did not impose upon KCP&L a

standard of care higher than that required by law. The trial court did not err in giving the

verdict-directing instruction to the jury.

Point III is denied.[7]

## Conclusion

The judgment of the trial court is affirmed.

_Mark D. Pfeiffer_

Mark D. Pfeiffer, Judge

Joseph M. Ellis, Presiding Judge, and
Gary D. Witt, Judge, concur.

---

[7] KCP&L also relies upon *Snyder v. Wagner Electric Manufacturing Company of St. Louis*, 223 S.W. 911 (Mo. 1920), a case where an ordinary care instruction was used in a case involving a wrongful death claim by the widow of a mechanic against the mechanic's employer for providing an unsafe workplace; the cord to the drill he was using electrocuted him. *Id.* at 916-17. Standard of care was not at issue in this case between an employee and employer; the claim against the defendant was not as a "supplier of electricity," but as an employer providing an unsafe workplace. *Snyder* has never been cited as authority by our courts for the proposition that "suppliers of electricity" are only required to provide ordinary care in the delivery of deadly electrical current to its customers; nor do we rely upon *Snyder* as it is inapposite to the facts and issues of this case.